UNITED STATES of America, Appellee,

v.

Charles P. GREZO, Joseph T. D'Agostino, Samuel L. Ebare, Richard Michael Beach, Appellants.

Nos. 46, 142, 190, 304, Dockets 76–1449, 76–1467, 77–1300, 77–1377.

United States Court of Appeals, Second Circuit.

Argued Sept. 23, 1977.

Decided Dec. 6, 1977.

---

Norman A. Palmiere, Rochester, N. Y. (Palmiere, Passero & Crimi, Rochester, N. Y.), for appellant Grezo.

David B. Weinstein, Auburn, N. Y. (Michael A. Wineburg and Carl Cannucciari, Auburn, N. Y., of counsel), for appellant Beach.

John R. Rinaldi, Syracuse, N. Y., on the brief for appellant D'Agostino.

Paul R. Shanahan, Syracuse, N. Y., on the brief for appellant Ebare.

Jeffrey C. Fisher, Sp. Atty., Dept. of Justice, Buffalo, N. Y. (Paul V. French, U. S. Atty., N. D. N. Y., Syracuse, N. Y., of counsel), for appellee.

Before FRIENDLY, SMITH and MULLIGAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Charles P. Grezo, Joseph T. D'Agostino, Samuel L. Ebare, and Richard Michael Beach appeal from a judgment of conviction entered by the United States District Court for the Northern District of New York, Lloyd F. MacMahon, *Judge*, having been found guilty, after a jury trial, of violating the federal gambling statute, 18 U.S.C. § 1955. In addition, D'Agostino ap-

peals from a conviction for conspiracy to violate § 1955,[1] as well as a conviction for violation of 18 U.S.C. §§ 1952 and 2.[2]

Raymond Czerwinski and Louis M. Camerano were convicted of the substantive offense of conducting an illegal gambling business in violation of 18 U.S.C. § 1955, as well as conspiracy to violate § 1955 and violation of 18 U.S.C. §§ 1952 and 2, respectively. They were subsequently placed on probation, and were not fined. They have not appealed their convictions.

Grezo and D'Agostino were sentenced to six months' imprisonment and a $5,000 fine. Ebare and Beach were each sentenced to a prison term of one year and one day, Ebare also receiving a fine of $5,000.

On this appeal, Grezo, Beach and Ebare argue that the government failed to present sufficient evidence to warrant a finding that they conducted, financed, managed, supervised, directed, or owned all or part of the D'Agostino bookmaking operation, within the terms of 18 U.S.C. § 1955. They, with D'Agostino, claim further that the government failed to demonstrate the involvement of five or more persons, as required by the statute.[3] Appellant Grezo asserts that the trial court incorrectly charged the jury with respect to the definition of a "conductor" of a bookmaking business, and that it failed to deliver a charge with respect to Grezo's stated theory of defense. Finally, appellant D'Agostino argues that the government's proof was insufficient to demonstrate a violation of 18 U.S.C. §§ 1952 and 2.[4]

We have examined the record, and find neither error on the part of the trial court, nor insufficiency in the government's proof. Accordingly we affirm the convictions as to each of the appellants.

I.

The government's case at trial was based largely on a series of recorded telephone calls intercepted from the home telephone of appellant D'Agostino and a telephone used by appellant Ebare. The interception of these communications was authorized by Judge Edmund Port, pursuant to 18 U.S.C. § 2510 et seq., and lasted in relevant part from December 21, 1974 to January 13, 1975. In addition, the government relied on the testimony of an expert witness, FBI Special Agent William L. Holmes, who testified as to the content and meaning of the recorded conversations. Others who testified for the government included James D. Keller, a Syracuse resident and regular customer of Raymond Czerwinski; James Colloca and Leon Cook, unindicted co-conspirators, who testified that they accepted wagers from customers and passed them along to the D'Agostino book; Lawrence Eppolito, who rented Ebare an apartment which was apparently used to conduct the bookmaking operation; FBI agents who carried out physical surveillance of the principals in this case; and a number of bettors who were customers of the D'Agostino book.

The appellants did not testify in their own behalf, nor did they call any witnesses.

At trial, the government sought to demonstrate that D'Agostino was the central manager of a bookmaking operation which was financed and directed by Ebare. Beach was said to be a collector for the organiza-

---

1. Appellant Ebare does not apparently attack his conviction for conspiracy. Since, however, we affirm his conviction on the substantive charge, we need not reach the question of whether a substantive reversal requires a reversal of the conviction for conspiracy in this case.

2. 18 U.S.C. § 1955 prohibits, inter alia, the conducting of an illegal gambling business. 18 U.S.C. § 1952 prohibits interstate travel or use of interstate commerce facilities to carry on a gambling business in violation of state law. 18 U.S.C. § 2 makes one who aids or abets anoth-

er in the commission of a federal offense punishable as a principal.

3. The appellants do not challenge the finding that the bookmaking operation violated New York state law or that it operated for a period in excess of 30 days, or that it had revenues of $2,000 on any single day.

4. D'Agostino challenges the sufficiency of proof with respect to counts 3, 4 and 5 of his indictment, but he was acquitted under count 4. Each of these counts charges a violation of 18 U.S.C. §§ 1952 and 2.

tion; Czerwinski, Cook and Colloca, "writers"; and Grezo, a layoff bookmaker. Camerano was described as the source of the betting "line" used by the operation.

The mechanics of the bookmaker's art have been well reviewed in the case reports. See, *e. g., United States v. Box*, 530 F.2d 1258, 1260–62 (5th Cir. 1976); *United States v. Joseph*, 519 F.2d 1068, 1070–71 (5th Cir. 1975), *cert. denied*, 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1976); *United States v. Thomas*, 508 F.2d 1200, 1202 n. 2 (8th Cir. 1974), *cert. denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975); *United States v. Schaefer*, 510 F.2d 1307, 1311 (8th Cir. 1974), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975). Accordingly, a brief sketch of the matter is sufficient for our purposes.

A bookmaker accepts wagers, often on the outcome of sporting events. His profit, however, does not come from winning bets. Rather, the bookmaker charges losing bettors a "brokerage" fee, called in the trade "vigorish" or "juice," which is a fixed percentage of the amount bet.

The financial risk to the bookmaker is minimized when the total amount bet on both sides of a contest is equal. Then losing bettors, in effect, pay the winners, and all of the "juice"—less expenses—is profit for the bookmaker.

Bookmakers use two principal devices to insure that bets on both sides of an event will be relatively balanced. First, they adopt a betting "line"—the odds under which a given bet will be accepted. The line on an event mandates a particular "point spread," the number of points by which a team must win (or lose) for the bettor to win his bet. The line for any single event can be varied over time if a bookmaker determines that bets under that line are excessively one-sided. But, it is in the interest of bookmakers to keep lines relatively uniform throughout the industry so as to discourage "betting the middle," a technique by which bettors can bet and win on both competing teams by taking advantage of different lines offered by competing bookmakers.

Second, a bookmaker can equalize the bets on both sides of an event by "laying off" excess bets with another bettor or bookmaker who, in effect, reinsures against the danger of excessive loss. By laying-off bets, a bookmaker will bring his books back into relative balance, and thereby minimize the risk of loss.

## II.

18 U.S.C. § 1955 makes it illegal to conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business. The courts have interpreted these terms broadly to include not only the upper, but also the lower, echelon of a gambling business. Thus we held in *United States v. Becker*, 461 F.2d 230 (2d Cir. 1972), *judgment vacated on other grounds*, 417 U.S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208 (1974), that all who participate in a gambling operation, "regardless how minor their roles," are "conductors" of the business. This includes agents, runners, "independent contractors," salesmen, and excludes only betting customers. Other circuits are in unanimous agreement on this interpretation of the statute. *United States v. Leon*, 534 F.2d 667, 676 (6th Cir. 1976); *United States v. Box, supra*, 530 F.2d at 1264; *United States v. Calaway*, 524 F.2d 609, 617 (9th Cir.), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1975); *United States v. Schaefer, supra*, 510 F.2d at 1311; *United States v. McHale*, 495 F.2d 15, 18 (7th Cir. 1974); *United States v. Sacco*, 491 F.2d 995, 1003 (9th Cir. 1974); *United States v. Ceraso*, 467 F.2d 653, 656 (3d Cir. 1972). Indeed, even doormen have been found to "conduct" gambling businesses. *United States v. Harris*, 460 F.2d 1041, 1049 (5th Cir.), *cert. denied*, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972). We need not go so far here.

Appellant Grezo asserts that even under the broad interpretation of "conduct" adopted by the courts, he cannot properly be said to "conduct" the D'Agostino bookmaking operation. This is for two principal reasons. First, Grezo claims that he is a mere bettor or customer, albeit a good cus-

tomer, of the D'Agostino book, and therefore outside the terms of the statute. Second, he urges that even if his bets are construed to be the layoff bets of a fellow bookmaker, his relationship with D'Agostino is that of an independent entrepreneur. Nothing links his business with that of D'Agostino but the bets that he places, and thus he has no real stake in the success of D'Agostino's business.[5] Similarly, D'Agostino's sole interest in Grezo relates to the business which he receives, which is to say to Grezo's role as a customer.

It is clear from the transcripts of relevant telephone calls that Grezo regularly bet large amounts of money with the D'Agostino book. Whether this makes him a "mere" bettor, as he contends, an independent bookmaker laying off bets, or a layoff bettor liable as a "conductor" of the business under § 1955 is the critical question at issue.

The trial transcript contains a number of passages which imply that Grezo was a bookmaker who placed layoff bets with D'Agostino. In announcing that he was "loaded" on a game, that he was "jammed," that he was "getting it all" on one team, that he had to get rid of some of his business, Grezo used language typical of the layoff bettor rather than the "mere customer." These few references among hundreds of pages of transcript may not themselves be sufficient to prove Grezo's status as a layoff bookmaker. Coupled, however, with reasonable inferences which might be drawn with respect to the nature of the many large bets Grezo placed on a practically daily basis, there is surely enough evidence in these transcripts for a reasonable juror to conclude, with the requisite degree of certainty, that Grezo was a layoff bookmaker.

It does not follow, however, that Grezo, even if a layoff bookmaker, is liable as a "conductor" of a gambling business. For we have still to consider Grezo's contention that he was an independent entrepreneur who operated a competing business.

The courts of appeals have now decided approximately 30 cases dealing with the liability of layoff bettors under § 1955. Most of these cases have found layoff bettors liable under the terms of the statute, although apart from this outcome, there is little in the way of legal doctrine which unifies the cases.

The decided cases can, for purposes of analysis, be divided into three principal categories: (1) those in which the appellant received layoff bets from the gambling business in question [see *United States v. McCoy*, 539 F.2d 1050, 1061 (5th Cir. 1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977); *United States v. Thomas, supra*, 508 F.2d at 1206; *United States v. Ceraso, supra*, 467 F.2d at 656]; (2) those in which the appellant exchanged layoff bets with a gambling business [see *United States v. DiMuro*, 540 F.2d 503, 507–08 (1st Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977); *United States v. Schaefer, supra*, 510 F.2d at 1311–12; *United States v. Thomas, supra*, 508 F.2d at 1206; *United States v. Sacco, supra*, 491 F.2d at 998]; and (3) those in which the appellant placed layoff bets with the gambling business in question.

The rationale which supports linking the appellant to a gambling business in the first two categories is straightforward. By accepting or exchanging layoff bets on an ongoing basis, the appellant functions as an integral part of that business by reinsuring it against loss, and thereby "financing" it within the meaning of § 1955.

The third category, which describes the case at bar, is more troublesome, however. For while it is clear that one who regularly receives layoff bets provides a service for the placer of those bets, it is much less clear that one who merely *places* layoff bets, even on a regular basis, can be said to aid the receiver of those bets in such a manner as to warrant being considered an associate. See *United States v. Guzek*, 527 F.2d 552, 558 (8th Cir. 1975).

---

5. We assume, *arguendo*, that Grezo could place layoff bets with other bookmakers if D'Agostino were unavailable.

Furthermore, there is a sense in which the placement of layoff bets is structurally similar to the placement of any other bet. And thus the layoff bettor gives the appearance, at least, of being a customer—a category exempted from liability under the statute. From the point of view of the gambling business, then, the layoff bettor represents a source of funds which is apparently no different from the ordinary customer.

These considerations tend to exonerate Grezo from liability under § 1955. There are, however, four further considerations which suggest the opposite result, and which, under the circumstances of the present case, we find compelling.

■ First, the examination of the legislative history of § 1955 indicates both that Congress intended to reach all manifestations of large-scale organized crime, and that Congress explicitly noted that layoff betting "accomplished through a network of local, regional, and national layoff men" provides a major source of funds for organized crime. See 1970 *U.S.Code Cong. & Admin.News* pp. 4029–30; President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in Free Society* (1967); 116 *Cong.Rec.* 590–91, 603–04 (1970) (Remarks of Senators McClellan and Allott); *Hearings on S. Res. 69 Before the Permanent Subcommittee on Investigation of the Senate Committee on Government Operation*, 87th Cong., 1st Sess., *Gambling & Organized Crime* (1961); *United States v. Becker, supra*, 461 F.2d at 232–33. No distinction is drawn between those who place and those who receive layoff bets. Both are involved in the national gambling network which is the target of the statute.

Second, while the layoff bettor and customer may appear to be *formally* similar, it is important to look at the substance of the transaction. Were we to hold that those bookmakers who place layoff bets with gambling businesses are not liable under § 1955, then merely by reorganizing the formal structure of such a business so as to "incorporate" participants as separate busi-

ness units, it might be possible to insulate those participants from criminal liability. We do not suppose that the Congress intended to elevate form above substance in this way.

Third, before placing a layoff bet, a bookmaker commonly receives the "line" from the gambling business. In one sense, this is a service which flows from the business to the layoff bettor, permitting him to run his own bookmaking operation more profitably. And this is not sufficient to implicate the bettor in the management of the business. In another sense, however, it is financially beneficial for the supplier of a "line" to convince fellow bookmakers to adopt his "line," for as noted above, this prevents customers from taking advantage of discrepancies in the "line" by "betting the middle." In this latter sense, then, the layoff bettor reciprocates the gambling business, thereby creating an ongoing community of interest which suggests the existence of a single business unit.

Finally, by placing a layoff bet a bookmaker "balances his book," and minimizes his risk of loss. But reciprocally, by *accepting* a layoff bet of a desired magnitude at the conclusion of the betting on a particular game, a gambling business is itself able to improve its balance of wagers. In this sense, then, layoff betting is of mutual significance, again suggesting a community of interest.

■ For all of these reasons, we conclude that when otherwise independent bookmakers regularly place consistent, substantial layoff bets with a gambling business, they should be considered to "conduct" that business within the meaning of § 1955, despite any superficial similarity which their activities may bear to those of the average customer. This is a matter of first impression in this circuit, but cases in other circuits suggest similar results. See, e. g., *United States v. Turzitti*, 547 F.2d 1003 (7th Cir.), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977); *United States v. DiMuro, supra*, 540 F.2d at 507–08; *United States v. Bohn*, 508 F.2d 1145, 1149 (8th Cir.), *cert. denied*, 421 U.S. 947, 95 S.Ct.

1676, 44 L.Ed.2d 100 (1975); *United States v. Guzek, supra*, 527 F.2d 552; *United States v. Brick*, 502 F.2d 219, 221, 224–25 (8th Cir. 1974); *United States v. McHale, supra*, 495 F.2d at 18.

There is plainly no inequity here in this interpretation of the statute, for Grezo's own statements indicate that he considered himself an important cog in the D'Agostino book's machinery. See, *e. g.*, Appendix for Appellee at 924: "I'm getting you business. . . . I'm out hustling." D'Agostino apparently agreed. When Grezo was late in calling in his bets, D'Agostino was worried. Appendix for Appellee at 939.

This type of regular, ongoing, consistent and substantial layoff activity as required by the charge, *infra* at 11, was plainly necessary to the success of the D'Agostino book. Compare, *United States v. McCoy, supra*, 539 F.2d at 1060.

### III.

■ Grezo argues on this appeal that Judge MacMahon's charge to the jury with respect to the requisite elements of "conducting" a gambling business was improper. The charge, in relevant part, is as follows:

> The word "conduct" means to carry on or to operate, or to cause to function, and refers both to high level bosses, and to street level employees. It includes all levels of personnel who participate in an illegal gambling business regardless of how minor their roles and whether or not they are called writers, collectors, runners, clerks, or employees. It includes agents or middlemen who accept bets from others, and pass them along to a single, central gambling business. It includes otherwise outside bookmakers who accept bets from their own customers, and lay them off to a single central operation on a regular, ongoing, consistent and substantial basis.

> It does not include anyone, including an outside or independent bookmaker who places a single, or isolated bet for his own customer, or who makes isolated and casual, rather than substantial and regular lay-off bets, or who occasionally ex-

changes line information with the central gambling operation.

> In short, a conductor includes all persons who participate in the operation of a gambling business, including those who participate in a network composed of other bookmakers, who join in a cooperative and consistent ongoing relationship with a single central gambling enterprise, and pool their bets, either through fairly regular layoffs, or profit sharing, or consistently and continuously share line information, or systematically transfer a substantial amount of business, or part of the action, or give advice concerning gambling operations. [Appendix for Appellee at 716–18.]

It follows from the position taken above that there is no merit to Grezo's claim that this charge is inconsistent with a proper reading of § 1955. And our determination that the government presented sufficient evidence for the jury to find that Grezo placed ongoing and regular layoff bets with the D'Agostino book undercuts the appellant's claim of evidentiary insufficiency with respect to his § 1955 conviction.

### IV.

■ Appellant Grezo argues that the trial court erred in failing to charge the jury with respect to his claimed defense—that he was a mere bettor. While the appellant does have a right to such a charge, he does not have a right to a particular wording of the requisite instruction. See 8A J. Moore, *Federal Practice* ¶ 30.03[1], n.14 (2d ed. 1955). Examination of the trial court's charge convinces us that the substance of Grezo's defense was put before the jury in terms which were both clear and fair to the appellant.

■ Appellants Ebare and Beach argue that the evidence offered by the government was insufficient, as a matter of law, to warrant a conviction under § 1955. Appellant D'Agostino argues the insufficiency of the government's evidence with respect to conviction under §§ 1952 and 2. We find these assertions untenable. The government's presentation of the tape recordings,

coupled with testimony by an expert witness, FBI agents, and unindicted co-conspirators is clearly sufficient to warrant a finding that both Ebare and Beach played active roles in conducting the D'Agostino book. Similarly, evidence presented by the government with respect to long-distance telephone calls placed from Las Vegas is sufficient to warrant D'Agostino's conviction for violation of §§ 1952 and 2.

Finally, the jury was warranted in finding the involvement of five or more persons, as required by § 1955.

We affirm the judgment of conviction as to each appellant.