612 F.2d 443
 UNITED STATES of America, Plaintiff-Appellee,
v.
Edward KAIL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Seymour BERGEN, Defendant-Appellant.
UNITED STATES of America,
v.
Russell CALLAHAN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Clarence Elden FREEMAN, Defendant-Appellant.
 Nos. 78-1633, 78-1643, 78-1772 and 78-1677.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 21, 1979.
As Amended Jan. 24, 1980.
Rehearing Denied Feb. 13, 1980.
 
 Ronald Bain, Arthur J. Lewis, Los Angeles, Cal., for defendant-appellant.
 Harvey T. Oringher, Sp. Atty. Los Angeles, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before WALLACE and TANG, Circuit Judges, and BATTIN,* District Judge.
 TANG, Circuit Judge.
 
 
 1
 The defendants, Edwin Kail, Seymour Bergen, Russell Callahan, and Clarence Freeman, together with two persons unnamed as defendants, were indicted on one count of conducting a gambling business, in violation of 18 U.S.C. § 1955. Bergen was also indicted on a second count, interstate transmission of wagering information, in violation of 18 U.S.C. §§ 1084 and 2. After they unsuccessfully moved to suppress evidence obtained by wiretaps, the defendants consented to be tried on a stipulation of facts and were found guilty on all counts. They now appeal, raising numerous issues but primarily emphasizing the legality of the wiretap. We affirm the convictions.I
 
 
 2
 On July 29, 1975, the Government received authorization to intercept wire communications from six telephone numbers that were subscribed to by three of the defendants. The indictment was not returned against the defendants until November 1977. Consequently, Bergen and Kail first contend that the indictment should have been dismissed because of preindictment delay.
 
 
 3
 Preindictment delay does not implicate the speedy trial guarantee of the sixth amendment, although in some instances it might violate the due process clause of the fifth amendment. United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). The due process test for impermissible preindictment delay requires a delicate balancing of the circumstances of each case. Arnold v. McCarthy, 566 F.2d 1377, 1383 (9th Cir. 1978). Primarily, the court must compare the gravity of the actual prejudice to the reasons for the delay. Id.; See Lovasco, 431 U.S. at 79, 97 S.Ct. 2044.
 
 
 4
 Bergen and Kail conclusorily alleged that they have been prejudiced by the loss of memory due to time and by the loss of possible witnesses to their activities. They do not, however, specify what they might have forgotten or who are the possible witnesses that they were unable to secure. Nor do they allege that the Government delayed bringing the indictment to obtain a tactical advantage. In these circumstances, their due process claim is unsubstantial. Arnold, 566 F.2d at 1383-85.
 
 II
 
 5
 Pursuant to the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-20, government agents obtained an order authorizing the interceptions of telephone communications by the defendants. The defendants raise a variety of reasons why the wiretap order was illegal. None are meritorious.
 
 
 6
 A. The Constitutionality of 18 U.S.C. § 2518
 
 
 7
 The defendants argue that the procedure specified in § 2518 for obtaining a wiretap is unconstitutional. This argument has previously been rejected by the court. United States v. Turner, 528 F.2d 143 (9th Cir. 1975), Cert. denied, 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1976).
 
 
 8
 B. Alleged Misrepresentations in the Affidavit
 
 
 9
 The Government's application for a wiretap was supported by the lengthy affidavit of FBI agent Darrell Shaver. In paragraph 45 of the affidavit, Shaver averred that confidential informants stated that even if they were immunized and given protective custody they would be unwilling to testify at any proceedings for fear of their safety. In the district court, Bergen offered to prove that an informant, Gary Hallman, had never been asked to testify, but if asked, would have testified, although reluctantly. The defendants thus contend that the offer of proof exhibited a material misrepresentation in the Shaver affidavit, warranting invalidation of the wiretap order.
 
 
 10
 Assuming that Hallman was one of the confidential informants referred to in the affidavit, the defendants have not persuaded us that there were material misrepresentations in Shaver's affidavit. The fact that Hallman was admittedly unwilling to testify demonstrates that any misrepresentation in the affidavit was not material. Furthermore, there were seven confidential informants mentioned by Shaver in the affidavit.
 
 C. The Requirements of § 2518(1)(c)
 
 11
 To show the necessity for a wiretap, the application must include a full and complete statement as to whether other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or would be too dangerous. 18 U.S.C. § 2518(1)(c). See, e. g., United States v. Martinez, 588 F.2d 1227, 1231 (9th Cir. 1978). The defendants contend that the Shaver affidavit lacked sufficient particularity to meet this requirement of necessity.[1]
 
 
 12
 Viewing, as we must, the affidavit as a whole, Id., we find that the Shaver affidavit did not consist of bald, conclusory statements, but instead provided sufficient particularized detail to demonstrate the need for a wiretap in the discrete circumstances of this case. The lengthy Shaver affidavit describes in considerable detail the history of the three-month investigation of the bookmaking operation prior to the application for the wiretap. Besides the personal observations of the government agents, the affidavit discloses the substance of information obtained from seven confidential sources, each of whose reliability is documented. Each source had some contact with either Bergen, Callahan, or Kail involving gambling in some way. The sources revealed that Burgen operated a large bookmaking business. They described Kail as the "back office" clerk of Bergen's Los Angeles operation, and Callahan as Bergen's Palm Springs agent who "settles-up" when he is in Los Angeles. Through both their sources and personal observations, the government agents were able to learn names, dates, and locations of the gambling operations.
 
 
 13
 Despite the success of the investigation using normal investigative techniques, the affidavit pointed out the deficiencies and limitations of the investigation. No one interviewed knew more than two participants in the operation. Additionally, Bergen changed the manner of operations, such as telephone numbers and methods of payment and collection, because he learned of the FBI surveillance from persons interviewed by the FBI. As a result, the information obtained from those interviewed became stale, and the possibility that Bergen would avoid detection increased. The agents also undertook physical surveillance of the persons named in the application and noted some contacts among the principals, but surveillance was generally unsuccessful in fully establishing the elements of the offense. The affidavit further described the reluctance of informants to testify, the futility of infiltration, and the limitations of employing telephone toll records in uncovering the nature of Bergen's operation. In short, the affidavit enabled the court to ascertain that the application was not intended to be used as a first step in the investigation, but an alternative that was necessary because of the limitations that the agents had encountered when using normal investigative techniques. See United States v. Spagnuolo, 549 F.2d 705, 710 (9th Cir. 1977).
 
 
 14
 Although the affidavit was not as detailed with respect to Callahan when compared with its description of Bergen and Kail, the affidavit read as a whole established the futility of using normal investigative procedures for all of the principals. "(A) particularized showing . . . may be established . . . not only by a minutia of detail discretely directed, but by persuasive facts pertaining in common to all of the principals and their telephones." United States v. Baker, 589 F.2d 1008, 1012 (9th Cir. 1979). Such was the case here.
 
 D. Prior Conversations
 
 15
 Callahan contends that the failure to set forth previous interceptions of his conversations violated § 2518(1)(e). Section 2518(1)(e) requires that the application set forth a statement concerning all previous applications, not interceptions, known to the person making the present application. By disclosing in paragraph 55 of the affidavit that he was aware that there had been previous applications for wiretaps of Callahan's phones, Shaver complied with § 2518(1)(e). As Callahan concedes, Shaver did not have to disclose all previous interceptions of Callahan's conversations. See United States v. Florea, 541 F.2d 568, 576 (6th Cir. 1976), Cert. denied, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977).III
 
 
 16
 After obtaining the wiretap order, government agents installed a pen register to learn the telephone numbers that were dialed on the monitored telephones. They did not obtain authorization to use this device. The defendants contend that a separate order was necessary to allow the government to use the pen register in conjunction with the wiretap.
 
 
 17
 Because pen registers do not intercept the contents of communications, they are not within the scope of Title III, United States v. New York Tel. Co., 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), and therefore, to install a pen register, the Government need not show compliance with Title III requirements. See United States v. Falcone, 505 F.2d 478, 482 (3rd Cir. 1974) Cert. denied, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975).
 
 
 18
 This does not mean that no authorization for the use of pen registers is required. However, once a valid wiretap order has been issued, as here, there need not be separate authorization for the pen register. Id. It is already possible to decipher the telephone numbers of outgoing calls by the use of a wiretap and tape recorder. The pen register, by automatically translating electrical impulses into the numbers dialed, avoids the need to interpret what has been recorded from the wiretap. This mechanical refinement provided by the pen register is thus comprehended within the terms of the wiretap order, making separate authorization unnecessary. Id. If, as defendants argue, the Government must support the use of the pen register by a showing of probable cause that showing is met by satisfying the probable cause requirements for obtaining the wiretap, See New York Telephone Company, 434 U.S. at 168-69, 98 S.Ct. 364.
 
 IV
 
 19
 In support of his motion to suppress the information obtained by the wiretaps, Callahan argued that statements contained in the Shaver affidavit were derived from wiretaps, subsequently found illegal, that were made in connection with the Vicki Balos case. In response, Shaver filed an affidavit stating that none of the statements pertaining to Callahan were derived from the Balos wiretaps. After a post-trial Alderman (Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)) hearing, the district court found that the Government had sustained its burden of showing that the affidavit was not derived from illegal wiretap.
 
 
 20
 The district court's finding was not clearly erroneous. Shaver explicitly denied that his information was derived from the illegal wiretap. Other than asserting the existence of the Balos wiretap, Callahan provided no evidence to demonstrate that the Shaver affidavit was tainted. The district court reasonably relied on Shaver's affidavit disclaiming that his information was tainted.
 
 V
 
 21
 In connection with his request for an Alderman hearing, Callahan moved on the day before trial for discovery of various items, including access to the affidavit requesting the Balos wiretap and recordings of Balos interceptions; the Government's files in the Balos prosecution; names and address of all persons monitored in the Balos wiretap or with knowledge of the wiretap; and access to the Government's file in his case. The court held an Alderman hearing and allowed discovery of the Balos affidavit and transcripts of some of the interceptions. Callahan nevertheless contends that the district court unreasonably restricted his access to discovery.
 
 
 22
 Even if a defendant makes a preliminary showing of taint, he is not entitled to unlimited access to Government files; the extent of discovery is left to discretion of the district court. Alderman, 394 U.S. at 185, 89 S.Ct. 961. There was no abuse of discretion in this case.
 
 
 23
 In November the district court issued an order that a hearing would be held if there were contested discovery matters. The parties stipulated that no hearing was necessary because there were no contested discovery matters. Callahan did not make his request for discovery until January 20, 1978, one working day before trial. Like the district court, we find it inconceivable that the defendant was not aware of the Balos action much earlier. Despite the untimeliness of Callahan's request, the district court allowed limited discovery. Particularly in view of the fact that Callahan provided no specific evidence of taint, we find that the district court's handling of Callahan's discovery request to be reasonable.
 
 VI
 
 24
 The defendants, without citation of authority, contend that 18 U.S.C. § 1955 is unconstitutional because it overreaches Congress' powers under the Commerce Clause. This precise contention was rejected in United States v. Sacco, 491 F.2d 995 (9th Cir. 1974) (en banc).
 
 VI
 
 25
 Finally, Feldman contends that the evidence was insufficient to prove that he committed a violation of § 1955.
 
 
 26
 The two stipulations, supplemented by the Government's exhibits of the wiretap transcripts, revealed that on nine or ten occasions Freeman accepted bets from Bergen. Although Freeman believed that some of these bets were for Bergen's personal account, it appears that Freeman was being regularly used as a lay-off source for the Bergen bookmaking operation. The wiretap transcripts are particularly revealing. They showed that Freeman accepted bets from the Bergen operation that he knew were lay-off bets, and furthermore, that Freeman exchanged line information with the operation. It can also be reasonably inferred from the transcripts that Freeman was conducting a betting operation of his own. In short, Freeman was not just an occasional and unknowing recipient of lay-off bets from the Bergen operation, but was sufficiently involved in the operation to have committed a violation of § 1955. See United States v. Baker, 589 F.2d 1008, 1013-14 (9th Cir. 1979).
 
 Conclusion
 
 27
 The convictions are affirmed.
 
 
 
 *
 Honorable James F. Battin, United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 Despite the defendants' lengthy arguments concerning our prior discussions of § 2518(1)(c), we decline to retrace the lines drawn in the numerous decisions of the court. See United States v. Baker, 589 F.2d 1089, 1091 (9th Cir. 1979)