UNITED STATES of America,
Plaintiff-Appellee,

v.

James Robert HAWTHORNE,
Defendant-Appellant.

No. 79–1732.

United States Court of Appeals,
Ninth Circuit.

Submitted May 6, 1980.

Decided July 16, 1980.

Rehearing Denied Sept. 11, 1980.

See also, D.C., 449 F.Supp. 1048.

Joseph Milchen, San Diego, Cal., for defendant-appellant.

Robert D. Rose, Asst. U. S. Atty., San Diego, Cal., argued for plaintiff-appellee; Brian Michaels, Sp. Asst. U. S. Atty., San Diego, Cal., on brief.

Before ALARCON and NELSON, Circuit Judges, and JAMESON,* District Judge.

PER CURIAM:

James Robert Hawthorne was convicted, following a court trial, of conducting an illegal gambling business in violation of 18 U.S.C. § 1955.[1] On appeal he contends that (1) the indictment should have been dismissed because two attorneys appointed to assist the United States Attorney were not authorized to conduct the grand jury proceedings resulting in the indictment; and (2) the evidence was insufficient to support the court's finding that appellant's gambling business was being conducted by "five or more persons" as required by § 1955. We affirm.

### Authority of Special Assistants to the United States Attorney

At the request of the United States Attorney for the Southern District of Califor-

---

* Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. 18 U.S.C. § 1955 provides in pertinent part: (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years or both. (b) As used in this section (1) "illegal gambling business" means a gambling business which . . . (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business . . . . .

nia, the Attorney General appointed James L. Duchnick and Richard D. Huffman as special assistants to the United States Attorney.[2] In that capacity each participated in the grand jury proceedings which resulted in appellant's indictment.

Appellant moved for dismissal of the indictment on the ground that the two attorneys were not properly authorized to appear before the grand jury because the letters from the Attorney General appointing the attorneys did not specifically direct them to conduct grand jury proceedings, as required by 28 U.S.C. § 515.[3] The Government contended that the attorneys were appointed pursuant to 28 U.S.C. § 543[4] rather than § 515, and that § 543 does not require that attorneys appointed pursuant to its provisions be specifically directed by the Attorney General to conduct grand jury proceedings. Appellant argued before the district court, as he does on this appeal, that § 515(a) is not "enabling legislation"; that § 543 empowers the Attorney General to make the appointment and § 515 then prescribes the "requirements to be followed once the appointment is effectuated".

■ In a well reasoned opinion the district court agreed with the Government and denied the motion to dismiss the indictment. Following a careful analysis of the provisions of § 515 and § 543 and their legislative history, the court concluded that

these specially appointed attorneys are properly considered attorneys appointed to assist the United States Attorney, pursuant to § 543, rather than assistants to the Attorney General pursuant to § 515. This conclusion is based upon the following facts: The work of Duchnick and Huffman was directly supervised by the United States Attorney, who authorized their appearance before the grand jury. In argument before the court, the United States Attorney, Michael Walsh, stated that Duchnick and Huffman have at all times been directly responsible to his office, and that he has complete control of their activities as prosecutors for the United States. Moreover, there is no indication in the record that there was any contact between the Attorney General and the specially appointed attorneys in this case other than the letter which appointed them as special assistants to the United States Attorney.

Accordingly, the court finds that Duchnick and Huffman, who were appointed as "special assistants to the United States Attorney," were attorneys appointed "to assist the United States Attorney" within the meaning of § 543. Therefore, since § 543 is an independent statutory basis for the appointment of attorneys to assist the United States Attorney, and since § 543 does not require that attorneys appointed pursuant to its provisions be specifically directed to conduct grand jury proceedings by the Attorney General, the indictments obtained in the grand

---

2. Each letter of appointment read in pertinent part:

As an attorney, you have been appointed as Special Assistant to the United States Attorney for the Southern District of California. You have been appointed for a period of one year. . . . It is understood that you will serve without compensation other than that which you are now receiving under your existing appointment with the State of California.

The appointments were part of a cooperative law enforcement program between the United States Attorney and the District Attorney of San Diego County. Duchnick and Huffman were deputy district attorneys for San Diego County.

3. 28 U.S.C. § 515 provides in pertinent part:

(a) The Attorney General . . . or any attorney specially appointed by the Attorney General under law, may, when *specifically directed* by the Attorney General, conduct any kind of legal proceeding, civil or criminal, *including grand jury proceedings* and proceedings before committing magistrates, which United States attorneys are authorized by law to conduct . . . . [Emphasis added]

(b) Each attorney specially retained under authority of the Department of Justice shall be commissioned as special assistant to the Attorney General or special attorney, and shall take the oath of office required by law.

4. Section 543 provides:

(a) The Attorney General may appoint attorneys to assist United States attorneys when the public interest so requires.

jury proceedings at which Duchnick and Huffman assisted are valid.

On this issue we adopt the opinion of the district court, which is reported at 449 F.Supp. 1048 (S.D.Cal.1978).

On appeal Hawthorne relies heavily on *United States v. Prueitt*, 540 F.2d 995, 999–1004 (9 Cir. 1976), *cert. denied*, 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977), a case not considered by the district court. It is true, as appellant argues, that the letters appointing Duchnick and Huffman would not meet the requirements set forth in *Prueitt* construing § 515. We agree with the Government, however, that *Prueitt* is distinguishable. There the special attorney was "an attorney for the Narcotic and Dangerous Drug Section of the Department of Justice". § 515 was admittedly applicable. The sole question was whether the Attorney General had complied with its requirements in his letter of authorization. In reviewing cases upholding letters of authorization under similar circumstances this court recognized that in enacting the statute which has become § 515(a) Congress was attempting to expand the authority of the Attorney General to combat crime and to make certain that the Attorney General and those under his direction were empowered to conduct criminal proceedings which the United States Attorneys were authorized to conduct.

In this case, however, the special attorneys were appointed at the request of the United States Attorney, worked under his supervision, and were authorized by him to appear before the grand jury. As the dis-trict court found, there was no indication of any contact between the Attorney General and the special assistant attorneys aside from the letters of appointment. We agree with the district court that § 543 is controlling and that the indictments were valid.

### Sufficiency of the Evidence

During 1976 Special Agents of the Federal Bureau of Investigation investigated bookmaking activities in which appellant participated. Between September and November of 1976, pursuant to a court order, they intercepted telephone conversations placed at a condominium at La Costa, California, and an apartment in Los Angeles, California. On December 5, 1976, the FBI seized gambling records from both premises pursuant to a search warrant.

At trial transcripts of the wiretapped conversations, expert testimony on gambling operations, and stipulated facts revealed that Hawthorne provided financing for a bookmaking operation run by Joseph Bassi and his wife at the La Costa condominium. This operation accepted bets on football games for a commission and exchanged "layoff bets", "line" information, and other information with various persons, many of whom were bookmakers.[5] The evidence also showed that Bassi frequently traveled to the Los Angeles apartment, where Samuel Traub operated a gambling operation involving five or more persons. While at Traub's apartment, Bassi continued his own operation and sometimes ex-

---

5. The terms "line" or "point spread" and "layoff" betting were defined by this court in *United States v. Baker*, 589 F.2d 1008, 1013, n. 8, 9 (9 Cir. 1979) as follows:

The "line" or "point spread" is a number of points given to the weaker team in a particular contest to make it as likely to win as the stronger team. The bookmaker must utilize a line to assure that bets are attracted to each team in equal amounts. If a bookmaker can achieve equal wagers on each team, he assumes no risk on the outcome of the game but is guaranteed a profit he charges the losing betters. (Stipulation of the parties.)

When betting action becomes heavy on one side, the bookmaker uses three principal de-vices to bring the betting volume into parity. He may refuse to accept bets on the heavy side hoping that continued betting on the other side will bring the game into balance. He may adjust the line making the underbet side a more attractive wager. More probably, however, particularly if game time is near, the bookmaker will bet the excess with another bookmaker. Known as a "lay-off" bet this wager is placed as if the laying-off bookmaker is betting and he must make the wager at the second bookmaker's line and must pay the prevailing profit if he loses. (Stipulation of the parties.)

changed gambling information and layoff bets with Traub.[6]

At trial appellant stipulated that the evidence proved all of the elements of the offense charged except for the involvement of "five or more persons who conduct, finance, supervise, direct or own all or part of [the gambling business], as required by 18 U.S.C. § 1955(b)(1)(ii). (See Note 1 supra). In considering the sufficiency of the evidence on this requirement, we must, of course, view the evidence in the light most favorable to the Government and give the Government the benefit of all inferences favorable to it that reasonably may be drawn from the evidence.

Following the court trial and argument of counsel, the trial judge in open court[7] found that the participation of five or more persons was "clearly established" and included, in addition to appellant and the Bassis, Samuel Traub, Billy Layton, Don DeCoy, and Leonard DiSandro. The court found further that the "lay-off betting that occurred between Mr. Bassi and Mr. Traub was clearly evident".

Appellant argues that the "government's proof evidenced at best isolated and casual instances of lay-off bets and exchanges of line information between his three person operation and the other persons whom the judge found were involved, and the contacts were not sufficient to satisfy the "five or more persons" requirement.

In finding that the various participants were "conductors" within the meaning of § 1955, the trial court relied heavily on

*United States v. Grezo,* 566 F.2d 854 (2 Cir. 1977), quoting at length from the opinion in that case. *Grezo* contains a comprehensive analysis of the legislative history and purpose of § 1955 and prior cases interpreting its provisions. The court said in part:

18 U.S.C. section 1955 makes it illegal to conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business. The courts have interpreted these terms broadly to include not only the upper; but also the lower echelon of a gambling business. Thus we held in *United States v. Becker,* 461 F.2d 230 (2d Cir. 1972), *judgment vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208 (1974), that all who participate in a gambling operation, "regardless how minor their roles," are "conductors" of the business. This includes agents, runners, "independent contractors", salesmen, and excludes only betting customers. Other circuits are in unanimous agreement on this interpretation of the statute. [Citations omitted.]

*Id.* at 857.

. . . [W]e conclude that when otherwise independent bookmakers regularly place consistent, substantial layoff bets with a gambling business, they should be considered to "conduct" that business within the meaning of § 1955, despite any superficial similarity which their activities may bear to those of the average customer.[8]

*Id.* at 859.

In *United States v. Sacco,* 491 F.2d 995 (9th Cir. 1974), this court interpreted the

---

6. Traub pleaded guilty to the count in the indictment on which appellant was convicted.

7. Pursuant to Rule 23 Fed.R.Crim.P. Hawthorne waived a jury trial in writing, with the approval of the court and the consent of the government. He also waived his right to request special findings of fact.

8. In formulating this rule, the court was persuaded by (1) Congressional recognition "that layoff betting 'accomplished through a network of local, regional, and national layoff men', provides a major source of funds for organized crime. See 1970 U.S.Code Cong. & Admin. News pp. 4029–30"; (2) the need to include layoff bettors within the purview of the statute

to prevent gambling businesses from insulating themselves from criminal liability by merely "recognizing the formal structure of such a business so as to 'incorporate participants as separate business units' "; (3) the "community of interest" between the layoff bettor and the gambling business arising through the exchange of "line" information which prevents "customers from taking advantage of discrepancies in the 'line' by 'betting the middle' "; and (4) the "community of interest" in placing and accepting layoff bets which allow the parties to balance their book or wagers and thus minimize the risk of loss. *Id.* at 859.

"five or more persons" requirement broadly and held that, "Each person, whatever his function, who plays an integral part in the maintenance of illegal gambling, conducts an 'illegal gambling business' and is included within the scope of § 1955. The sole exception is the player or bettor." Id. at 1003. In *United States v. Baker*, 589 F.2d 1008, 1014 (9 Cir. 1979), we held that it was "reasonable to conclude that [a person] violate[s] Section 1955 [when] he regularly and directly exchange[s] line information and layoff bets with [other persons] as an integral part of the illegal gambling business". More recently we concluded in *United States v. Kail*, 612 F.2d 443 (9 Cir. 1979), that where on nine or ten occasions the defendant accepted layoff bets from his codefendant's operation and exchanged line information, the defendant was "not just an occasional and unknowing recipient of layoff bets from [his codefendant's] operation, but was sufficiently involved in the operation to have committed a violation of § 1955". *Id.* at 449.

It is true, as appellant contends, that "isolated and casual lay off bets and an occasional exchange of line information may not be sufficient to establish that one bookmaker is conducting or financing the business of a second bookmaker". *United States v. Thomas*, 508 F.2d 1200, 1206 (8 Cir.), *cert. denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975). This was recognized in *United States v. Grezo, supra*, in the approval of the following instruction (quoted in appellant's brief):

A "conductor,"

does not include anyone, including an outside or independent bookmaker who places a single, or isolated bet for his own customer, or who makes isolated and casual, rather than substantial and regular lay-off bets, or who occasionally exchanges line information with the central gambling operation.

In short, a conductor includes all persons who participate in the operation of a gambling business, including those who participate in a network composed of other bookmakers, who join in a cooperative and consistent ongoing relationship with a single central gambling enterprise, and pool their bets, either through fairly regular layoffs, or profit sharing or consistently and continuously share line information, or systematically transfer a substantial amount of business, or part of the action, or give advice concerning gambling operations.

566 F.2d at 860.

■ Reviewing the evidence in light of the foregoing principles, we first conclude that the evidence was sufficient to show and that the appellant—Bassi bookmaking operation and Sam Traub's bookmaking operation involved mutual gambling business. The Government intercepted at least three conversations in which Traub exchanged layoff bets with Bassi and discussed the "line" and other gambling information. Traub and Bassi shared the Los Angeles apartment for the purpose of conducting their gambling businesses. Traub admitted on cross-examination that both his and appellant's customers could reach him or Bassi at the Los Angeles office and that Bassi did receive gambling calls over the phone. Appellant admitted on cross-examination that he telephoned Bassi at Traub's office "to ask questions about players of ours and line and what not" and on at least one occasion appellant discussed gambling information with Traub. Finally, the FBI agent who served the search warrant at Traub's apartment in Los Angeles testified that while in the apartment he received two phone calls from appellant in which appellant identified himself as "Sam's partner". On the second call appellant requested that the agent change the line on a football game. This evidence establishes the inference that there was an integral relationship between Traub's and appellant's operations, as the district court found. It is sufficient to conclude that both men were "conductors" of the other's operation. Appellant stipulated at trial that Traub operated a bookmaking business involving at least five participants. The five participants in the Traub operation with the three participants in appellant's operation establish a violation of § 1955.

The evidence is sufficient to show that Don DeCoy was a "conductor" of appellant's gambling operation. Testimony showing the nature of DeCoy's relationship was provided by William L. Holmes, the Government's gambling expert.[9] After viewing the Government's exhibits of wiretap transcripts, he concluded that DeCoy was a bookmaker; that on several occasions he placed wagers with Bassi; and that the language used when he made these wagers indicated that they were layoff bets.[10] This evidence is similar to the evidence presented in *Kail, supra*, where we held that nine or ten occasions showing the defendant accepted layoff bets and exchanged line information were sufficient to show a violation of § 1955. The trial court properly found that DeCoy was a "conductor" of appellant's gambling business.

While the evidence with respect to Layton and DiSandro was less conclusive, we are satisfied from our review of the record and the wiretap transcripts that there was sufficient evidence to support the trial court's finding that both were "conductors" of the illegal business. The testimony of Holmes the Government's expert witness, supports that conclusion. Layton was a bookmaker who supplied "line information" to the Bassi-appellant operation. Bassi acknowledged that he depended on Layton for line information "to a degree". DiSandro was a bookmaker who placed at least three "layoff" bets with the Bassi-appellant operation.

Even assuming, *arguendo*, that the participants in Traub's organization, Layton and DiSandro may not be counted in determining whether five or more persons were involved, the participation of Traub and DeCoy, with appellant and the Bassis, satisfied the "five or more persons" requirement of § 1955.

AFFIRMED.

---

9. The trial court could properly rely upon this expert testimony. See *United States v. Rotchford*, 575 F.2d 166, 172 (8 Cir. 1978). Special Agent Holmes also testified for the Government in *Rotchford* and in *United States v. Grezo, supra*, 566 F.2d at 856.

10. Appellant argues "that the credible evidence as to Don DeCoy" indicated only that DeCoy "was one of Bassi's regular wagering customers". Appellant's expert witness testified that the timing, amount, and form of DeCoy's bets were inconsistent with layoff wagering. The trial judge, however, determines credibility and was free to reject the conflicting testimony provided by Hawthorne's expert's testimony. Rule 23, F.R.Crim.P., *United States v. Rojas*, 458 F.2d 1355 (9 Cir. 1972).