**UNITED STATES of America, Appellee,**

v.

**Rocco D. REITANO, Defendant–Appellant.**

**No. 196, Docket 88–1208.**

United States Court of Appeals, Second Circuit.

Argued Oct. 11, 1988.

Decided Dec. 8, 1988.

Frederick C. Emery, Jr., Asst. U.S. Atty., Rochester, N.Y. (Dennis C. Vacco, U.S. Atty., for the W.D.N.Y., Rochester, N.Y., on the brief), for appellee.

John P. Costello, Rochester, N.Y. (Geiger & Rothenberg, Rochester, N.Y., on the brief), for defendant-appellant.

Before KEARSE, PRATT, and MAHONEY, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Rocco D. Reitano appeals from a judgment of conviction entered in the United States District Court for the Western District of New York following a jury trial before David G. Larimer, *Judge,* convicting him of conducting an illegal gambling business on May 10, 1987, in violation of 18 U.S.C. §§ 1955 and 2 (1982). Reitano was sentenced to a term of imprisonment of one year and one day, a fine of $2,500, and a special penalty assessment of $50. On appeal, he contends principally that the trial evidence was insufficient to establish that his business "ha[d] a gross revenue of $2,000 in any single day," *id.* § 1955(b)(1), and hence to establish that § 1955 was applicable to him. We disagree and affirm the judgment of the district court.

## I. BACKGROUND

Reitano was charged with conducting an illegal gambling business in a Rochester, New York club on May 10, 1987. At trial the government presented testimony describing two blackjack games that Reitano offered his patrons in the early morning hours of May 10. During that period, Rochester policemen conducted two brief inspections of the club, the first at about 1:00 a.m. and the second just before 3:00 a.m. Because a buzzer sounded in the club to warn those inside of the inspections, any gambling within was halted during the police visits. Immediately after the first inspection was concluded, the first blackjack game began. One of Reitano's doormen testified that, except for a 10–minute interruption due to the second police inspection, this game ran continuously until at least the time he went off duty at about 7:00 a.m. A second blackjack game was conducted for some 15–30 minutes; this game was halted by the second police inspection and never resumed.

From 2 a.m. to 3:10 a.m. on May 10, Federal Bureau of Investigation Special Agent Michael Glass attended Reitano's

club in an undercover capacity. Glass testified at trial as an expert on gambling, as an observer of the first blackjack game, and as a participant in the second. He characterized the type of blackjack played at Reitano's club on May 10 as "rough and tumble," a form in which players are pitted against each other rather than, as in casino- or Las Vegas-style blackjack, against the gambling establishment (the "house").

In rough-and-tumble blackjack, the players at a table take turns at being the "bank," i.e., dealing and putting up the money against which the other players bet. If the dealer wins a hand, the wagers belong to him and not to the house. The house nonetheless has a stake in each hand since it takes a percentage (the "rake") from the bets in a given hand. The house stations an employee (the "houseman") at each table; the houseman, though he neither deals nor bets, keeps the game running efficiently, and he collects the rake.

On May 10, Reitano's housemen controlled the two blackjack games. In each, the houseman started the shuffle and enlisted one player to be the bank and thus to become the dealer. The houseman inquired how much that player wished to wager, gave him the cards to deal, and asked other players in turn if any of them wanted to play against the dealer for the entire amount in the bank. When one player answered affirmatively, creating a one-on-one game, the houseman collected the wagers of both the dealer and his opponent, removed the house's rake—five percent— from these wagers, and announced how much remained in the pot. When the hand was complete, the houseman paid the pot to the winner, who could then choose whether to play another hand, acting as the bank, or to relinquish the right to deal. If no single player was willing to place a bet against the dealer for the entire bank, then all the table's players were entitled to play the hand, placing bets of any amount against the dealer, provided the total wagers did not exceed the amount in the bank. During such a table-against-the-bank game, the bets remained in front of the players, while the houseman held the dealer's bank money. On the bank player's deal of the cards, whenever an opponent's card combination showed a total exceeding 21, the houseman took that player's cards and the money he had bet, adding that money to the bank; when any of the players beat the dealer, the houseman paid him out of the money in the bank. When the hand was finished, the houseman took the house's five percent rake of the money remaining in the bank and offered the dealer the option of playing as bank again or taking his money. The cycle was then renewed, either with the same player as the bank or with a new player stepping into that role.

As to the amount of the bets placed in Reitano's club on May 10, agent Glass "estimated conservatively" that in the first game about 10 hands an hour were played and the average amount per hand wagered against the dealer was between $240 and $250. Glass thus concluded that the dealer's opponents bet a total of approximately $2,400 in the first game during the roughly one hour he was there. One of Reitano's housemen, who observed the first game for a period prior to supervising the second game, estimated that the players bet between $100 and $200 per hand and that 8–10 hands were played each hour. Both witnesses' estimates as to the amounts bet in the second blackjack game were considerably lower.

Reitano was found guilty of violating § 1955 and was sentenced as indicated above.

## II. DISCUSSION

On appeal, Reitano contends principally that the amounts wagered could not, as a matter of law, define his club's gross revenue because (a) the wagers were between customers and hence no part should be considered revenue to the club, or (b) only the house's rake from the amounts wagered could be considered revenue to the club, or (c) only amounts wagered by customers other than the bank player could properly be considered. He also contends the government should not have been permitted to rely on estimates to prove the

amounts wagered. None of these contentions has merit.

## A. *Gross Revenues*

Section 1955(a) imposes criminal penalties on any person who "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business." 18 U.S.C. § 1955(a). An "illegal gambling business" within the meaning of § 1955(a) is defined, in pertinent part, as one that "has a gross revenue of $2,000 in any single day." *Id.* § 1955(b)(1)(iii). In challenging the use of amounts wagered to establish his club's gross revenue, Reitano relies on the fact that rough-and-tumble blackjack involves no bets against the house, and he contends that the amounts wagered therefore did not constitute revenue to the house within the meaning of § 1955. We disagree.

Enacted as part of Title VIII of the Organized Crime Control Act of 1970, § 1955 was included in order to allow the federal government to cut off income from illegal gambling, described as the " 'the lifeline of organized crime.' " S.Rep. No. 617, 91st Cong., 1st Sess. 71 (1969) ("S.Rep. 617") (quoting President's Message on Organized Crime ("President's Message"), H.R. Doc. No. 105, 91st Cong., 1st Sess. 6 (1969)). Nonetheless, Congress did not seek to reach all illegal gambling activity, and the $2,000-gross-revenue-in-a-day portion of the statutory definition was fashioned in order to reach operations that did substantial amounts of gambling business but to exclude operations "of insignificant monetary proportions." S.Rep. 617, at 73; *see also Hearings on S. 2022, etc. Before the Subcomm. on Criminal Laws and Procedures of the Senate Comm. on the Judiciary,* 91st Cong., 1st Sess. 399–400 (1969) (testimony of Henry E. Petersen, Deputy Assistant Attorney General).

■ While Congress did not define "gross revenue," the language used in the legislative history suggests that it meant that term to encompass all of the moneys coming into the possession of the gambling establishment. The President's Message had urged Congress to adopt legislation making it a federal crime to engage in an illicit gambling operation from which the daily "take" was more than $2,000, *id.* at 449, and the term "take" was also used during hearings and floor debates, *see id.* at 401 (subcommittee counsel inquiring whether law enforcement officers would be aided, in efforts to obtain search warrants, by a presumption of a "2,000–a–day take"); 115 Cong.Rec. 10786 (1969) (statement of Rep. McCulloch describing $2,000 as focusing on the "daily 'take' "). In common slang usage, the term "take" refers to "the money received," and it may connote either "receipts or profit." *Webster's New Twentieth Century Dictionary of the English Language, Unabridged* 1859 (2d ed. 1979). It is clear, however, as other courts have concluded, *see, e.g., United States v. Sacco,* 491 F.2d 995, 1001 (9th Cir.1974) (en banc); *United States v. Ceraso,* 467 F.2d 653, 657 (3d Cir.1972), that "take" was not used by Congress to refer merely to profit since the only pertinent definitions in any of the bills it considered used the term "gross" revenues. *See, e.g.,* S. 2022, 91st Cong., 1st Sess. § 201(b)(3), 115 Cong.Rec. 10736 (1969); H.R. 10683, 91st Cong., 1st Sess. § 201(b)(3) (1969), *Hearings on S. 30, etc. Before Subcomm. No. 5 of the House Comm. on the Judiciary,* 91st Cong., 2d Sess. 975 (1970).

We are left with the inference, therefore, that "take" meant all sums received, regardless of any sums that might later have to be paid to bettors. This inference is supported by Congress's use of other descriptions of the $2,000 gross revenue provision that suggested even more plainly the intention that, in calculating gross revenue, all amounts received as wagers were to be considered. For example, Senator Allott repeatedly referred to the amounts that illegal gambling operations such as casinos, bookmakers, and lotteries were "handling," stating that the premise of this part of the proposed statutory definition was that most of the gambling operations in which the federal government would be interested would "handle at least $2,000 daily." 116 Cong.Rec. 604 (1970). References to the amounts "handle[d]" by gambling establishments reveal an intent to include in

the $2,000 provision the total wagers dealt with by the house.

The legislative history also belies any suggestion that Congress sought to define gross revenue differently for different types of gambling operations, and references to amounts "handle[d]" by bookmakers are particularly instructive for purposes of the present case, for a bookmaker earns his profits in much the same way that a rough-and-tumble blackjack establishment does: "His profit ... does not come from winning bets. Rather, the bookmaker charges losing bettors a 'brokerage' fee, ... which is a fixed percentage of the amount bet." *United States v. Grezo*, 566 F.2d 854, 857 (2d Cir.1977); *see generally United States v. Box*, 530 F.2d 1258, 1260–62 (5th Cir. 1976); *United States v. Sacco*, 491 F.2d at 998 & n. 1. We think it plain that Congress intended the $2,000 figure to refer to the daily total of the amounts wagered with a bookmaker rather than to the bookmaker's percentage of those bets. The same view has been taken of a poker game in which the house made its profit by taking a rake from the pot. *See United States v. Zemek*, 634 F.2d 1159 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981). In *Zemek*, the "house had an interest in all amounts bet at the pot limit poker game: a dollar per pot charge plus a percent of each pot," and the "[h]ouse dealers would 'rake off' the pot." *Id.* at 1178. The court upheld a jury instruction that the house's gross revenue for a single day should be considered "the total amount of money wagered." *Id.* at 1177. We see no reason to apply a different standard to the rough-and-tumble blackjack operator.

There is one major difference between a bookmaker and a rough-and-tumble blackjack operator, but it does not redound to Reitano's benefit. One of the devices used by the bookmaker to reduce his risk of loss is the "laying off" of excess bets with another bettor or another bookmaker. *See, e.g., United States v. Grezo*, 566 F.2d at 857; *United States v. Sacco*, 491 F.2d at 998 & n. 1. If he cannot lay off all such bets, the bookmaker will retain some risk of loss. In contrast, the rough-and-tumble operator, in effect, automatically lays off with the bank player all of the bets of the other players; only the players are at risk of losing, and the house has no risk of loss at all. This difference, however, hardly indicates that the status of rough-and-tumble operators should be judged only by the amount of their rake rather than by the total amounts they handle, for given the aim to cut off gambling funds as organized crime's lifeline, Congress cannot be deemed to have intended to exclude a handler of substantial wagers just because it has only the prospect of profit and no risk of loss.

■ Against this background, we reject all of Reitano's arguments as to how his club's gross revenue on May 10 should have been calculated. Reitano's housemen controlled the flow of the blackjack games, supervised all of the betting, maintained possession of both the bank player's stake and the stake of his opponent in a one-on-one game, kept possession of the bank player's stake in a table-against-the-bank game, and, in the latter type of game, paid the winning table players and collected the bets of the losers. In either type of game, the housemen ensured that the house received its proper percentage of the sums bet. Given the house's control of the games and its stakes in the wagers, the legislative history indicates that the total amounts wagered should be included in the computation of the house's gross revenues.

The fact that the wagers were between customers does not mean, as Reitano would have it, that the wagers were akin to "side bets" and should not be considered revenues to the club. The record reveals that in fact Reitano's club had a stake in every wager described by the witnesses. In any one-on-one game, the house took a percentage of all sums wagered; in any table-against-the-bank game, the house took a percentage of all sums left in the bank at the end of the game.

Finally, Reitano argues that amounts bet by the bank player should not be included in the computation of gross revenues to the house because if the house itself were the bank, its own wagers would not be con-

sidered. We doubt the merit of this analogy since Reitano's club took a rake from the sums bet by the bank player. However, we need not resolve this question since, as discussed in Part II.B. below, the evidence was sufficient to establish that more than $2,000 was wagered by the players other than the bank player.

### B. *Proof Through Use of Estimates*

 We also reject Reitano's contention that the amounts wagered on May 10 were not adequately proven because the proof consisted of estimates. "[I]t has long been established that 'the result of the witness[es]' observation[s] need not be positive or absolute certainty....'" *United States v. Evans*, 484 F.2d 1178, 1181 (2d Cir.1973) (quoting 2 Wigmore, *Evidence* § 657 (3d ed. 1940)); *cf.* Fed.R.Evid. 701 (allowing witnesses to testify as to inferences, if based on their perceptions and helpful to determine a fact in issue). Thus, when an undercover agent has observed a gambling operation, he is permitted to testify as to his estimate of the amounts wagered while he was present. *United States v. Zemek*, 634 F.2d at 1178. In such circumstances, any imprecision in the estimates is a matter to be argued to the jury rather than a reason for excluding the evidence.

The estimates on which principal reliance was placed in the present case were given by agent Glass and two of Reitano's employees. All were at the club on May 10, and all based their estimates on their personal observations. Their testimony was properly received in evidence.

■ Finally, taken in the light most favorable to the government, the evidence was ample to permit a rational juror to find beyond a reasonable doubt that in the first blackjack game alone the amounts bet by players other than the bank player exceeded $2,000. This evidence included estimates by Glass that in about one hour the players other than the dealer bet an average of $240–$250 per hand and that about 10 hands were played. One of the housemen who observed this game for a similar length of time estimated that an average of $100–$200 per hand was bet and that 8–10 hands were played per hour. Thus, estimates of the amounts bet ranged from $800 per hour to $2,500 per hour. Since the doorman testified that this game was in operation from 1 a.m. until at least 7 a.m. with only a 10–minute break, the jury was permitted to infer that the total amount of the wagers handled by the house on May 10, excluding money put up by the bank player, was at least $4,600 to $14,600.

### CONCLUSION

We have considered Reitano's other arguments on appeal and have concluded that they lack merit and do not require discussion. The judgment of conviction is affirmed.