UNITED STATES of America,
Plaintiff–Appellee,

v.

Lamont Arnold ZEMEK, Richard Francis Caliguri, John Joseph Carbone, Frank Julius Mazzuca, George V. Janovich, Joseph M. Carbone, and Ronald John Williams, Defendants–Appellants.

Nos. 79–1536, 79–1537, 79–1549 to 79–1552, 79–1567 and 80–1143.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 11, 1980.

Decided Oct. 6, 1980.

As Amended Oct. 7, 1980.

Rehearing Denied Jan. 7, 1980.

David E. Wilson, Asst. U. S. Atty., Seattle, Wash., Gloria J. Shanor, Sp. Asst. U. S. Atty., Atlanta, Ga., for plaintiff–appellee.

Kenneth E. Kanev, Seattle, Wash., for Caliguri.

Robert Bryan, Lanning & Bryan, Seattle, Wash., for Mazzuca.

Monte E. Hester, Tacoma, Wash., for Janovich.

Graham Hughes, Gerald L. Shargel, New York City, for Carbone.

James S. Kempton, Seattle, Wash., for Williams.

Gary G. Weber, Puyallup, Wash., for Zemek.

Before WRIGHT and SNEED, Circuit Judges, and ENRIGHT, District Judge.*

EUGENE A. WRIGHT, Circuit Judge.

Appellants attack the sufficiency of the evidence to support their convictions for a racketeering conspiracy and numerous substantive offenses connected therewith. They also assign error to designated instructions and evidentiary rulings. We affirm.

Count 1 of the seventeen count indictment charged fifteen confederates with conspiring over a seven–year period (1971 to 1978) to conduct the affairs of an "enterprise", the tavern business of Pierce County, Washington, through a pattern of racketeering. 18 U.S.C. § 1962(d).

The alleged racketeering activities included acts and threats of murder, arson and bribery (in violation of state law) and gambling, mail fraud, extortion and obstructing

* Of the District of Southern California.

communication to criminal investigators (in violation of federal law). The remaining counts charged several defendants with these substantive federal crimes.

The seven appellants include the owners and operators of several taverns in Pierce County (John Carbone and his son, Joseph; Williams; and Mazzuca); and alleged "strong–arm" (Caliguri); a "middleman" (Zemek); and the "protector" (former Pierce County Sheriff Janovich). The indictment characterized John Carbone as the "leader" of the organization with Ron Williams as his "chief lieutenant."

Because appellants challenge the sufficiency of the evidence as to several counts, the evidence adduced at trial as to each count will be discussed separately. We view the evidence, as we must, in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Basey,* 613 F.2d 198, 201 (9th Cir. 1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 274 (1980).

*FACTS*

The mass arrests of defendants in November 1978 marked the culmination of a federal undercover operation begun in the fall of 1977. The investigation was prompted by a rash of arsons at Pierce County taverns and topless dancing establishments. Between 1972 and 1977 three taverns in which Williams, Mazzuca, John Carbone, and Joe Carbone had ownership or management interests were destroyed by fire.[1] All were insured. There was evidence that, prior to the fires, the establishments had been experiencing poor business. Thereafter, mortgages and debts were paid, the premises were remodeled or new establishments were opened nearby.

Between 1976 and 1978 seven suspected arsons also occurred at the establishments of competitors in the tavern, disco or topless dancing business.[2] Because local law en-

forcement officers were unsuccessful in apprehending the perpetrators, the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) began a joint investigation of the tavern fires with the sheriff's office in the fall of 1977.

By April 1978, evidence indicated Sheriff Janovich was providing information to a principal target (Williams). The ATF feigned abandonment of the investigation and dissolved the "partnership." Thereafter, the FBI and ATF conducted an undercover operation.

After his arrest in April 1978, defendant Michael Valentine agreed to cooperate with the ATF. Thereafter, the government recorded conversations between Williams and Valentine in which Williams admitted responsibility for arranging the attempted assassination of a state liquor control board supervisor responsible for policing Pierce County taverns for alcohol and topless dancing violations. In November 1977, the supervisor had been shot four times and seriously wounded.

At trial Valentine testified that he hired defendants Bentley and Johnson to execute the murder contract solicited by Williams. The government introduced evidence of motive. Three taverns in which Williams and the Carbones had management or ownership interests received notices of topless dancing violations, entailing temporary closures in the months preceding the murder attempt. Williams, John Carbone, and Joe Carbone frequently expressed vitriolic dissatisfaction with the inspector's stringent enforcement activities.

Valentine was also instrumental in introducing undercover agents as Chicago "mobsters" whereby they were able to penetrate gambling activities at Mr. Lucky's and Stan & Ollies, taverns and cardrooms owned and managed by Williams and Mazzuca. Gam-

---

1. The Players (1972); The Exit (1976); Black Knight (1977).

2. The Family Amusement Center was damaged by fire in March 1977. The Top of the Ocean disco and restaurant was destroyed by fire in

April 1977. The Black Forty tavern suffered three arsons in 1977. The Night Moves tavern was firebombed in November 1977 and destroyed by fire in February 1978.

bling included blackjack and pot limit poker games illegal under state law.[3]

Posing as a potential buyer of Mr. Lucky's tavern and the related gambling activities, an agent was informed that a price could be negotiated to include the law enforcement protection arrangement with the sheriff's office. Mazzuca and Williams participated actively in these negotiations. Williams arranged an initial meeting between the "buyer" and Sheriff Janovich.

In 1976 the Internal Revenue Service (IRS) had initiated a criminal investigation of John Carbone and his activities. Carbone accused Jerome Weinstein, a former business associate, of informing to the IRS. Shortly thereafter, Weinstein's home suffered a series of firebombings and arsons. He was assaulted and seriously injured.

Concurrent with this undercover operation, agents consensually recorded conversations in an attempted extortion scheme involving John Carbone and Williams. John Carbone met with Weinstein soliciting $10,000 to be paid to Williams for protection against harassment. Weinstein agreed to cooperate with the FBI and record conversations with Carbone.

In the fall of 1978 the FBI was also able to infiltrate a nascent plot to bomb a competitor's tavern. In the process of concluding the "sale" of Mr. Lucky's tavern to an undercover agent, Williams sought the "buyer's" help in locating a bomber to blow up the Night Moves tavern, a topless dancing establishment owned by Ron Chase.

The government introduced evidence that Night Moves provided the primary competition for Joseph Carbone's Flitter In. Night Moves had previously been the object of two arsons. In addition, in August 1978 Chase's home had been entered by an armed man subsequently identified as Caliguri who threatened the occupants with bodily injury unless Chase ceased operations.

The FBI arranged for an undercover agent to pose as the bomber. Williams set up the initial telephone contact, giving the number for Vista Auto Sales. John Carbone, Joe Carbone and Williams were observed listening for varying periods to this phone conversation. Caliguri met several times with the bomber to discuss details.

On November 28, 1978, at the time the final telephone contact was expected at Vista Autos, agents arrested John and Joe Carbone and Williams on the premises. The remaining defendants were apprehended the same day.

 Six of the fifteen defendants pleaded guilty and testified at trial. Taped conversations between and among Valentine, Weinstein, and undercover agents, on the one hand, and John Carbone, Williams, Mazzuca, Zemek, Caliguri and Janovich, on the other, formed an important part of the government's case.[4]

---

3. Under Washington law wagers are restricted to a $5.00 maximum. *Wash.Rev.Code* § 9.46.-020(20)(f); *Wash.Admin.Code* 230–40–120. Pot limit poker games run for the profit of the house are felonious under state law. *Wash. Rev.Code* § 9.46.220. *See* §§ 9.46.020(20)(c)–(d); −.020(17).

Under Washington law blackjack games are illegal unless played in connection with charitable events and with a special license. *Wash. Rev.Code* § 9.46.030(7).

4. The district court expressly found the tapes and transcripts to be accurate and authentic and this finding is not challenged on appeal. *See United States v. King*, 587 F.2d 956, 961 (9th Cir. 1978).

Janovich does assert that tapes of conversations between an undercover agent, and himself and Williams, should be excluded as obtained contrary to state law. *Wash.Rev.*

*Code*, Ch. 9.73.030 (prohibiting recordings absent consent of *all* parties or court order). The conversations were recorded pursuant to 18 U.S.C. § 2511(2)(c) which permits recording if *one* party gives prior consent or acts under "color of law."

To be admissible, the recordings need only satisfy federal law and constitutional requirements. *United States v. Keen*, 508 F.2d 986 (9th Cir. 1974), *cert. denied*, 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975). If one party consents, there is no federal constitutional violation. *Id.* Thus, even though state statutes may require the consent of both parties, admissibility in federal court is determined by federal law. *United States v. Testa*, 548 F.2d 847, 855 (9th Cir. 1977).

Janovich's attempt to distinguish his case from *Keen* is not persuasive. He argues state law applies because he was "charged" with "underlying state crimes." Although state of-

After a three month trial,[5] the jury acquitted defendant Levage of all charges and returned guilty verdicts against the seven remaining defendants as to all counts in which they were named. The trial court imposed generally concurrent sentences and cumulative fines.[6]

## RACKETEERING CONSPIRACY: COUNT I

Title IX of the Organized Crime Control Act of 1970 added Chapter 96 entitled, "Racketeer Influenced and Corrupt Organizations" (RICO) to Title 18 of the United States Code. RICO prohibits investment in, control, or operation of an "enterprise" through a pattern of racketeering activity. See 18 U.S.C. §§ 1961–1968. RICO defines "enterprise" somewhat ambiguously to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The definition of "racketeering activity" incorporates eight state crimes and twenty–four specified federal crimes. 18 U.S.C. § 1961(1).[7]

fenses are incorporated into federal racketeering and gambling statutes, violation of state law is not the sole element of the charged federal offenses. The statutes serve independent federal purposes and are not merely an attempt to enforce state law. See United States v. Forsythe, 560 F.2d 1127, 1135 (3d Cir. 1977); In re Bianchi, 542 F.2d 98, 101 (1st Cir. 1976); United States v. Sacco, 491 F.2d 995, 1003 (9th Cir. 1974) (en banc).

The indictment charged Janovich with federal offenses. The recordings satisfied the requirements of the constitution and federal law.

5. The indictment was returned on December 8, 1978 in the Western District of Washington. On January 26, 1979, and February 9, 1979, the trial court granted motions for change of venue and the case was ultimately transferred to the Northern District of California, the Honorable Morell E. Sharp of the Western District of Washington, sitting by designation. Trial by jury began on March 19, 1979, and concluded with verdicts on June 19, 1979.

6. John Carbone and Williams received multiple concurrent sentences and cumulative fines for all counts. Carbone was charged and convicted on 14 counts. Williams was charged and convicted on 13 counts. Both were sentenced to two 22–year terms for counts 1 and 2 (alleging violations of 18 U.S.C. § 1962(c) and (d)) to be served concurrently. Both were sentenced to five years on each of the remaining counts to be served concurrently with each other but consecutively to the count 1 sentence. Thus, both effectively received 25 year sentences. The total amount of the fines imposed against John Carbone was $163,000; the total for Williams was $172,000.

Mazzuca received a 15–year sentence for count 1. He was charged and convicted on three other counts for which he received three five–year sentences to be served concurrently with each other and count 1. The court imposed fines totalling $25,000.

Joseph Carbone was sentenced to 18 years on count 1. The sentences on the four remaining counts for which he was convicted are to be served concurrently with count 1. The aggregate fine for all counts was $38,000.

The court imposed no fines against Janovich, Caliguri or Zemek and ordered their sentences be served concurrently. Thus, Janovich and Zemek were sentenced to effective terms of 12 years; Caliguri received a maximum 18–year sentence for the five counts for which he was convicted.

7. 18 U.S.C. § 1961(1) provides:

"Racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472 and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating

Finally, RICO requires a "pattern" of racketeering activity: at least two acts of racketeering committed within a period of ten years. 18 U.S.C. § 1961(5). The alleged pattern herein consisted of 29 predicate offenses involving, *inter alia*, multiple acts of arson, extortion and gambling.

Section 1962, the substantive portion of RICO, employs the foregoing definitions to create three offenses. *See* 18 U.S.C. § 1962(a)–(c). Pertinent to this appeal is subsection 1962(c) which prohibits any person employed by or associated with an enterprise from conducting its affairs through racketeering activity.[8] Count I charged each appellant with a conspiracy to violate this subsection under 18 U.S.C. § 1962(d). The indictment alleged 107 overt acts in furtherance of this conspiracy.

Appellants raise three objections related to count one: (1) permitting application of RICO to defendants' activities; (2) failing to charge multiple conspiracies; and (3) insufficiency of the evidence.

## 1. *RICO Enterprise*

■ Appellants assert that their activities did not fall within the scope of the term "enterprise," a statutory element of the RICO offense. They argue that their alleged operations were wholly illegitimate, and therefore, outside the purview of RICO which evinces Congressional concern with criminal infiltration of legitimate businesses.

This argument is unavailing in light of Ninth Circuit precedent to the contrary. Furthermore, ample evidence exists to negate appellants' premise that the enterprise in question was wholly illegitimate.

This circuit has rejected the argument that wholly illegitimate enterprises are outside the scope of RICO and has held that an association formed for illicit purposes will satisfy the enterprise requirement. *United States v. Rone*, 598 F.2d 564, 568 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). Although criticized,[9] this is the prevailing statutory interpretation.[10]

A few courts, notably the Sixth and Eighth Circuits, have refused to adopt the expansive definition. *United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979), submitted for rehearing en banc, April 2, 1980; *United States v. Anderson*, 626 F.2d 1358 (8th Cir. 1980) (RICO requires ·discrete economic as-

to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;

8. 18 U.S.C. § 1962(c) provides:
(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

9. *See, e. g., United States v. Aleman*, 609 F.2d 298, 311 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) (Swygert, J., dissenting); *United States v. Rone*, 598 F.2d 564, 573–74 (9th Cir. 1979),

*cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) (Ely, J., dissenting); *United States v. Grzywacz*, 603 F.2d 682, 690–91 (7th Cir. 1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980) (Swygert, J., dissenting); *United States v. Altese*, 542 F.2d 104, 107–110 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977) (Van Graafeiland, J., dissenting). Bradley, Racketeers, Congress & the Courts: An Analysis of RICO, 65 Iowa L.Rev. 837, 892–93 (1980); Note, 65 Va.L.Rev. 109 (1979); Note, 27 De Paul L.Rev. 89, 105, 112 (1977).

10. *See, e. g., United States v. Whitehead*, 618 F.2d 523 (4th Cir. 1980); *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). *United States v. Swiderski*, 593 F.2d 1246 (D.C. Cir. 1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979); *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977).

sociation separate from pattern of racketeering). *Cf. United States v. Mandel*, 415 F.Supp. 997, 1020 (D.Md.1976) (pretrial order, not alleged as error on appeal).

Although *Rone* was decided prior to *Sutton*, other circuit courts addressing the issue thereafter have not followed the Sixth Circuit. *See, e. g., United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Whitehead*, 618 F.2d 523 (4th Cir. 1980). *See also, United States v. Provenzano*, 620 F.2d 985, 992–93 (3d Cir. 1980). *But see, United States v. Anderson, supra.*

Even if the broader definition of "enterprise" adopted in *Rone* did not bind this panel, the charged enterprise satisfies the narrower definition of a group "organized and acting for some ostensibly lawful purpose, either formally declared or informally recognized." *United States v. Sutton*, 605 F.2d at 273. The concern of the *Sutton* majority and of commentators is that the enterprise concept not be extended to include a loosely confederated group of criminals who perform unrelated criminal acts. *See* Note, *Elliott v. United States* : Conspiracy Law and the Judicial Pursuit of Organized Crime Through RICO, 65 U.Va. L.Rev. 109, 119, n. 68 (1978). This is not such a case.

Certain appellants owned or operated more than six taverns in Pierce County during the relevant period. Organized and acting for ostensibly lawful purposes, they undertook to discourage competition and law enforcement investigation through arson, extortion, and physical violence. Further, they used a legitimate business as an alleged "front" for illegal gambling. This is precisely the type of operation Congress intended to encompass within the enterprise concept. *See United States v. Swiderski*, 593 F.2d 1246 (D.C.Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979) (restaurant used as a front for narcotics operations).

### 2. *Multiple Conspiracies*

Appellants assert that while count 1 alleged but a single conspiracy, the evidence adduced at trial established two separate conspiracies resulting in a variance affecting their substantial rights. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

John Carbone contends: (1) the incidents involving Jerome Weinstein (overt acts 4–5, 10–11, 15, 28, 51–55, 59–61, 65–67, 75, 79, 82, 87–93, 99) constitute a conspiracy independent of the tavern–related crimes; (2) the evidence adduced at trial as to Carbone's participation related only to the "Weinstein matter"; and (3) it was prejudicial error to try him for a single conspiracy.

◼ The recurrent issue of multiple conspiracies involves questions of severance, variance, and misjoinder which restate the basic contention that the evidence proved several separate conspiracies. *United States v. Jabara*, 618 F.2d 1319, 1327 (9th Cir.), *cert. denied*, 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980). The general test is whether there was "one overall agreement" to perform various functions to achieve the objectives of the conspiracy. *See United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir.), *cert. denied*, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977). Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a "single overall agreement." *United States v. Friedman*, 593 F.2d 109 (9th Cir. 1979). The general test also comprehends the existence of subgroups or subagreements.

Appellants assert there was no connection between the harassment and extortion of Weinstein and the "larger" conspiracy to control the tavern business in Pierce County. It was the government's theory that Weinstein was an enterprise target because he was believed to have been an IRS informant.

As Weinstein's former business associate, John Carbone was in the best position to know what incriminating evidence Weinstein possessed as to Carbone operations.

IRS scrutiny could expose the extent of Carbone's financial interests in various enterprise operations and jeopardize enterprise profits. As the alleged "head" of the enterprise, John Carbone might indeed fear a federal tax investigation.

Several circuits have applied a "factors" analysis to distinguish single from multiple conspiracies. *See, e. g., United States v. Cambindo–Valencia,* 609 F.2d 603, 623–25 (2d Cir. 1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980); *United States v. Becker,* 569 F.2d 951, 960 (5th Cir.), *cert. denied,* 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). Relevant factors include the nature of the scheme; the identity of the participants; the quality, frequency and duration of each conspirator's transactions; and the commonality of time and goals. A single conspiracy can be identified here either by isolating various elements under the "factors" analysis or by aggregating evidence under the "single agreement" test.

The nature of the instant scheme was to operate and control enterprise taverns and related activities with minimal interference from law enforcement agencies. This entailed numerous actions to protect illegal activities (e. g., unauthorized topless dancing and gambling) from law enforcement scrutiny. It engendered a pervasive concern regarding investigation by the state liquor board, the ATF, and the IRS.

The potential threat posed by local law enforcement officials was minimal because the sheriff had been successfully bribed. As Williams related to an undercover agent, the only investigators to fear were the IRS or the "feds."

Throughout this period, John Carbone insisted that Weinstein had provided or would provide the IRS with information. He indicated to Weinstein his belief that law enforcement efforts could not succeed without a "stoolie." The harassment activities against Weinstein confirm that he acted upon this belief.

Continuation of enterprise activities was dependent upon concealment. The operations were particularly vulnerable to feder-

al investigation. The so-called "Weinstein matter" was not merely a separate, personal vendetta by John Carbone.

The use of violence to stifle law enforcement efforts was a common denominator. When the state liquor inspector became persistent, a murder attempt was orchestrated. Similarly, a brutal assault was arranged because Weinstein was a perceived threat.

Threats, arson, and extortion were employed against Weinstein, as well as enterprise competitor, Ron Chase. It is undeniable that the Weinstein matter and the tavern conspiracy had overlapping participants. Williams solicited Valentine's services for arson and assault contract procurement in both. Zemek, Levage, and Wilcox were also common participants in arson activities. The evidence revealed a continuing relationship among participants organized in a hierarchical pattern.

The allegedly separate conspiracies were also united in time and place. Count 1 charged a conspiracy from 1971 to November 1978. The attacks upon Weinstein occurred from 1976 to November 1978, within the time span of the conspiracy and during the time when other crimes were occurring (for example, the plot to blow up the competing Night Moves tavern). The Weinstein harassment activities promoted the overall goal of the conspiracy by discouraging cooperation with law enforcement officials and providing an object lesson to minions within the enterprise.

The activities were consistent with one overall agreement to control and manipulate taverns and related illegal activities in Pierce County. The unity of time and place, the common identity of participants, the similarity of method and purpose combine to provide a rim sufficient to connect the various spokes of a single conspiratorial wheel.

Having reviewed the record with care, we conclude that there was no variance between the allegations of the indictment and the evidence presented. Thus, the refusal of the trial court to instruct on multiple conspiracies caused no prejudice and is not

reversible error. *United States v. Perry,* 550 F.2d 524, 533 (9th Cir.), *cert. denied,* 434 U.S. 827, 98 S.Ct. 104, 54 L.Ed.2d 85 (1977). The court's instructions were sufficient. *See United States v. Kearney,* 560 F.2d at 1363.[11]

As an alternative or supplemental argument in support of its single conspiracy theory, the government asserts that even if a single conspiracy cannot be identified under traditional analysis, the enterprise concept in RICO supplants conventional conspiracy doctrine and defeats appellants' multiple conspiracy objections. Because a single conspiracy can be identified using traditional conspiracy analysis, we need not determine if RICO permits a joint trial of otherwise non–joinable conspiracies.[12]

### 3. *RICO Conspiracy*

a. *Admission of Co–Conspirators' Statements*

■ Before examining the sufficiency of the evidence, we meet appellants' objections to the receipt in evidence of co–conspirators' statements. Statements by one co–conspirator during the course and in furtherance of a conspiracy are admissible as vicarious admissions against another co–conspirator. *See United States v. Sando-*

*val–Villalvazo,* 620 F.2d 744 (9th Cir., 1980). Admission of a co–conspirator's statement is predicated upon independent proof of defendant's participation, however. *See* Fed. R.Evid. 801(d)(2)(E).

Two objections are raised here. First, Janovich argues that a *pretrial* determination of admissibility is required. Second, John Carbone asserts there was insufficient prima facie proof of his involvement, independent of the co–conspirators' statements.

The district court provisionally admitted the co–conspirators' statements subject to establishing the requisite independent proof. Thereafter, it expressly found that a prima facie case of involvement had been established as to the appellants. Janovich argues that a pretrial determination of admissibility is required.

■ This court has held repeatedly that the order of proof is within the sound discretion of the trial court. *United States v. Sandoval–Villalvazo, supra.* The procedure of conditionally admitting co–conspirator's statements subject to later motions to strike is well within the court's discretion. *United States v. Batimana,* 623 F.2d 1366, 1369 (9th Cir. 1980). Finding no abuse of discretion, we uphold the court's provisional admission of the statements.[13]

---

11. *United States v. Eubanks,* 591 F.2d 513 (9th Cir. 1979) does not dictate a contrary result. Therein the court reversed a conviction based on juror bias. In dictum, the court considered the issue of multiple conspiracies because it was likely to arise on remand. The court expressly relied on *United States v. Perry,* 550 F.2d 524 (9th Cir.), *cert. denied,* 434 U.S. 827, 98 S.Ct. 104, 54 L.Ed.2d 85 (1977), in which the court stated at 533:

> When the possibility of a variance appears between the indictment and the trial proof, the trial court should instruct the jury on multiple conspiracies. . . . However, because of our finding, *supra,* that there is no such variance in the instant case, the failure of the trial court to instruct on multiple conspiracies caused no harm or prejudice to the defendants and, as such, is not reversible error.

12. In *Elliott v. United States,* 571 F.2d 880 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), the Fifth Circuit construed the enterprise concept in RICO as circumventing limitations imposed by conventional con-

spiracy doctrine. 571 F.2d at 900. The court described RICO as supplanting the common objective rationale of conspiracy law with the enterprise concept whereby criminal association itself could constitute an enterprise.

It has been noted that the language and legislative history of RICO do not expressly indicate an intent to rework basic conspiracy law as related to organized crime. *See* Note, 65 U.Va. L.Rev. 109 (1979). *See also United States v. Anderson,* 626 F.2d 1358 (8th Cir. 1980). In any event, the conspiratorial objective herein is not as ill–defined as in *Elliott.* A single overall agreement can be identified under conventional conspiracy doctrine.

13. Janovich urges this court to follow the Fifth Circuit citing *United States v. James,* 576 F.2d 1121 (5th Cir. 1978), modified en banc, 590 F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). In its en banc opinion, the Fifth Circuit expressed a "preference" for pretrial determination of admissibility, if "reasonably practicable." 590 F.2d at 587. In light of consistent Ninth Circuit precedent allowing conditional admission, we

The test for admission of co–conspirators' statements is whether there is "sufficient, substantial evidence" apart from them to establish a prima facie case of conspiracy and defendant's slight connection therewith. *United States v. Weiner*, 578 F.2d 757, 768–69 (9th Cir.), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978). Although John Carbone does not challenge the existence of a conspiracy, he does assert there was insufficient independent evidence linking him to the conspiracy.

Carbone's own taped conversations with Weinstein provide the primary evidence linking him to specific activities of the conspiracy. Therein, Carbone admitted his experience in providing "protection" and using muscle; his "control" of Williams; his familiarity with gambling operations; and his transactions with persons he described as "Mafia". His recorded conversations indicated he had observed the assault upon Weinstein.[14] He offered no explanation by evidence or argument for these admissions.

Carbone's reliance upon *United States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980) is misplaced. The Fifth Circuit found that absent the statements of co–conspirators, the case against Diecidue was "built of supposition on a foundation of inference." 603 F.2d at 555. Carbone's taped statements provide a direct link to his involvement in controlling taverns and his personal role in the related extortion of Weinstein. The government established the requisite connection to permit admission of co–conspirators' statements.

### b. *Sufficiency of Evidence*

John Carbone, Joe Carbone, Zemek, Caliguri, and Janovich challenge directly the sufficiency of the evidence under Count 1.[15] Once the facts are established, viewed in the light most favorable to the government, the test for sufficiency is whether jurors could reasonably decide to act in their own serious affairs on factual assumptions as probable as the conclusion the defendants were guilty beyond a reasonable doubt. *United States v. Price*, 623 F.2d 587, 591 (9th Cir. 1980).

In measuring a conspirator's complicity, the court must decide if there was sufficient evidence to conclude: (1) the charged conspiracy existed; (2) defendant

---

reject Janovich's argument for a mandatory pretrial determination. We note that even under the Fifth Circuit's asserted preference, the practicality of a pretrial determination is questionable here.

**14.** Carbone told Weinstein that he could describe, in "very authentic" detail, Weinstein's assault. He stated that Weinstein was "hollerin" and he "heard him." He related details about the assault and that the assailant was "supposed to get paid by the limb" but his weapon broke.

**15.** Although Mazzuca attacks the admission of certain evidence, *see* note 18, *infra*, he does not directly challenge the sufficiency of the evidence as to count 1. He does assert that a conspiracy to obstruct state gambling laws, 18 U.S.C. § 1511, is not properly chargeable as a predicate crime of a RICO conspiracy under 18 U.S.C. § 1962(d). He argues inclusion thereof creates a "conspiracy to conspire" which is void for vagueness.

RICO itself has consistently withstood constitutional challenges as void for vagueness. *See, e. g., United States v. Campanale*, 518 F.2d 352, 364 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). The essence of a RICO conspiracy is not an agreement to commit predicate crimes but an agreement to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering. "Pattern" is expressly defined as two or more predicate offenses. 18 U.S.C. § 1961(1) lists several acts of racketeering including violation of 18 U.S.C. § 1511. 18 U.S.C. § 1961(1)(B). *Cf. United States v. Weisman*, 624 F.2d 1118 (2d Cir. 1980) (conspiracy can be properly charged as predicate act under 18 U.S.C. § 1962(c) when it involves any of the substantive offenses listed in § 1961(1)(D)).

Count 1 did not charge appellants with a conspiracy to conspire. *Cf. United States v. Feliziani*, 472 F.Supp. 1037, 1042 (E.D.Pa.1979), aff'd, 622 F.2d 580 (3rd Cir. 1980) (evidence sufficient to support convictions under both 18 U.S.C. § 1962(d) and § 1511).

Mazzuca further objects to application of RICO as unconstitutional, citing *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Absent development of authority and some relation to the facts of this case, we decline to hypothesize constitutional defects.

had at least a "slight" connection therewith; and (3) defendant knew he was connected with the charged conspiracy. *United States v. Smith*, 609 F.2d 1294, 1297 (9th Cir. 1979). Appellants focus upon the final element. The evidence against each will be reviewed individually.

■ John Carbone's primary argument is that he had retired from the tavern and bail bonding businesses and his only business interest during the relevant period was Vista Auto Sales. There is a significant body of credible, circumstantial evidence that he retained both financial and personal control of several enterprise operations. As discussed above, the most damaging evidence against him was his own taped statements to Weinstein intimating his involvement in illegal activities. Carbone also told of "unloading" money on politicians with the tacit understanding that help would be forthcoming when needed.

Carbone claimed that Janovich would do anything he wished. He bragged that Williams "performed" for him and had made him a millionaire. In taped conversations, Zemek and Williams indicated they perceived Carbone as their superior. There was evidence Williams frequently visited Vista Autos, often prior to making business decisions. John Carbone met privately with Williams and Janovich several times at the office of his attorney.

In April 1977, a disco–restaurant in competition with an enterprise operation was destroyed by fire. Carbone's attorney testified that when co–defendant Levage attempted to retain him to defend arson charges in state court, he was told that John Carbone and Williams would pay the fee.

Vista Autos, an acknowledged Carbone operation, served as the communication center for the planned bombing of Night Moves. John was observed listening to the crucial phone conversation with the bomber for a short time. A few hours later he was observed leaving Joe Carbone's Flitter In accompanied by Williams who carried the identifying signal requested by the bomber.

Carbone does not challenge the evidence as to the Weinstein extortion, relying upon his multiple conspiracies argument rejected above. The record does not support his assertion that there was no evidence against him except as to the Weinstein counts. There was abundant evidence of his connection with the conspiracy revealing his role as a financier and overseer of the enterprise.

Joseph Carbone asserts that he and Williams were "mere associates" and he was not involved in the plots and schemes attributable to Williams. The relationship between Williams and Joe was more than a mere association. Both were insured together for two establishments, Flitter In and Back Door Disco. Williams referred to Joe as his "partner" in topless clubs.

Prior to taking retaliatory actions against a competitor, Williams stated he asked Joe to verify that the "target" did not operate under the protection of an alleged Mafia figure in an adjoining county. John Carbone frequently referred to "Joe and Ron [Williams]" when speaking to Weinstein about his business affairs. We reject Joe Carbone's "mere association" argument.

The government produced evidence of Joe's involvement in "torching" a tavern owned by his father which was experiencing bad business.[16] His topless dancing operation, the Flitter In, was in direct competition with Night Moves. There was ample evidence of his involvement in the bomb plot against Night Moves. We find sufficient evidence from which the jury could conclude beyond a reasonable doubt that Joseph Carbone was a knowing member of the conspiracy.

Zemek characterizes the evidence against him as merely indicative of associational ties with the primary actors. He dismisses his taped admissions as "drunk talk" and false bravado. His intimate knowledge of many details belies this purported defense.

On tape Zemek admitted involvement in a firebombing of the Night Moves tavern

---

**16.** *See* pp. 1180 1181, *infra.*

and his responsibility for one fire at Weinstein's residence. He told of taking money to co–defendant Levage, imprisoned on a state conviction for burning a competing disco.

Zemek solicited Valentine to set fire to a tavern which Williams and he had been unable to acquire. There was sufficient evidence to permit an inference that he was then working for the enterprise.

The Fourth Circuit has said that the "conduct or participate" language in § 1962(c) requires proof of involvement in the operation or management of the RICO enterprise. *See, e. g., United States v. Mandel*, 591 F.2d 1347, 1375 (4th Cir.), rev'd on other grounds, 602 F.2d 653 (4th Cir. 1979) (en banc) *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). Zemek's assertion that he was unaware of the scope of the enterprise and did not agree to conduct its affairs ignores his active participation and his solicitation efforts. That he knew the structure of the organization is clear from his statement that Williams was owned or controlled by "Dagos", an admitted reference to the Carbones, particularly John. There was ample evidence of Zemek's participation and involvement in the operation of the enterprise.

Caliguri asserts the evidence did not establish that he was a knowing member of the conspiracy. He was identified as the masked intruder who broke into the home of competitor Ron Chase and threatened the occupants if the Chases continued their topless dancing business. He was also identified as the person who tailed Chase.

There was evidence that Caliguri executed Joe Carbone's order to "do something about" an enterprise tavern experiencing bad business. Shortly after that directive, the tavern was destroyed by fire. Caliguri was also active in the plot to blow up Night Moves. When he was arrested, agents found a shaving kit in Caliguri's car con-

taining his gun and the home phone numbers of John and Joe Carbone and Williams. The evidence established Caliguri was a knowing and willful conspirator.[17]

Sheriff Janovich strenuously asserts that he was but an acquaintance of the principals herein. The evidence showed a long–term relationship between John Carbone and Janovich. John Carbone's attorney testified to several meetings between Janovich, Carbone and Williams at his office. Janovich arranged an introduction and meeting between John Carbone (ostensibly retired) and the jail superintendent of an adjoining county to discuss expanding the Carbone bail bond business. Carbone bragged of his control over Janovich.

In 1976 Janovich arranged a meeting between Williams and an assistant attorney general directing the state's organized crime unit. On tape, Williams revealed that Janovich had warned him of federal "heat" in the spring of 1978.

The indictment assigned Janovich both protection and harassment roles. There was some evidence of his involvement in an "emphasis patrol" of an enterprise competitor, culminating in visits by fifteen law enforcement personnel within a thirty–minute period. The government presented circumstantial evidence of Janovich's efforts to stifle arson investigations. On tape Williams suggested that if business were poor, a tavern could be "torched" and the sheriff would limit investigation.

The most damaging evidence against Janovich was taped conversations regarding the protection aspect of the conspiracy. Therein he acknowledged his awareness of a warning system and his intent not to interfere in illegal gambling operations. That a price was exacted for such cooperation is clear. One gambling operator at an enterprise tavern testified that Janovich pocketed a $100 payment which the "donor" intended for protection. Janovich also ac-

---

17. Caliguri claims that the government proved that he conspired to commit only one predicate crime. The evidence showed that in fact he agreed to commit a substantial number of predicate crimes on behalf of the enterprise. Appellant conspired to commit a *series* of predicate crimes against Night Moves (arson, extortion, bombing). He was also aided in three separate instances of mail fraud. *See* pp. 1180–1181, *infra*.

cepted $1,300 from the undercover agent posing as the buyer of Mr. Lucky's.

Janovich testified that he accepted these payments as campaign contributions yet they were not reported on campaign disclosure forms. Indeed, no record was made of their receipt. The jury could reject his explanation as implausible. *See United States v. Young*, 573 F.2d 1137, 1139 (9th Cir. 1978) (it is the exclusive function of the jury to weigh the credibility of witnesses). Janovich's actions were those of a "knowing participant." *See United States v. Whitehead*, 618 F.2d 523 (4th Cir. 1980) (county attorney agreed to give advance notice of raids to prostitution ring in return for cash payments and free services).

■ There was sufficient evidence to support the conviction of each appellant under count 1.[18] We now examine the other challenged counts.[19]

*HOBBS ACT*

■ Count 6 charged Zemek, Caliguri, John and Joe Carbone and Williams with violating 18 U.S.C. § 1951 by attempting to obstruct interstate commerce by extortion to obtain the goodwill and customer revenues of a competing tavern, the "Night Moves", owned by Ron Chase. The elements of a Hobbs Act violation are extortion and a nexus with interstate commerce. *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The alleged forceful acts include damaging the tavern with a Molotov cocktail in November 1977; destroying Night Moves by fire in February 1978; tailing the owners of the tavern; breaking into their home and threatening the occupants in August 1978; and plotting to blow up the tavern in November 1978.

■ Zemek, Caliguri and Williams argue no violation was established because: (1) no "property" was obtained or sought; (2) no wrongful inducement was employed; and (3) the Chases did not consensually yield any property. All five appellants argue the evidence was insufficient.[20]

---

**18.** Mazzuca challenges admission of certain evidence pertaining to overt acts in the count 1 conspiracy. Overt acts need not be criminal but must be in furtherance of the conspiracy. *United States v. Young*, 573 F.2d 1137 (9th Cir. 1978). If evidence of other misconduct tends to prove some element of the crime charged, such as knowledge, intent, motive, design or scheme, it may be admissible.

Once the trial court determines evidence of extrinsic acts is relevant, it must weigh the probative value of the evidence against its prejudicial effect and that determination is not disturbed absent an abuse of discretion. *United States v. Riggins*, 539 F.2d 682 (9th Cir. 1976), *cert. denied*, 429 U.S. 1045, 97 S.Ct. 749, 50 L.Ed.2d 758 (1977). An important consideration in this process is whether the other acts are closely connected in time and nature to the offense charged. We find such a connection. The district court did not abuse its discretion in admitting the challenged evidence.

**19.** Only Williams and John Carbone were sentenced to terms to be served consecutively with the count 1 sentence. *See* note 6 *supra*. As to the Carbones, Williams and Mazzuca, the practical effect of reversal on any of the remaining counts would be a reduction in fines.

The court imposed concurrent sentences and assessed no fines against Janovich, Zemek, and Caliguri. Nevertheless, the nature of the charges and the complexity of the case compel us to examine the challenges as to the remaining counts rather than invoke the concurrent sentence doctrine.

**20.** Caliguri also asserts no interstate commerce nexus was established. The effect on interstate commerce need only be *de minimis*. An actual effect is not required for an attempted Hobbs Act violation; the effect need only be "probable" or "potential." *See United States v. Phillips*, 577 F.2d 495 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978). *See also, United States v. Brooklier*, 459 F.Supp. 476 (C.D.Cal.1978).

There was evidence the Chases purchased supplies and hired employees from out-of-state. Threatened depletion of resources from a business engaged in interstate commerce provides an adequate jurisdictional base. *United States v. Phillips, supra*. The jury was so instructed (No. 18). It is not necessary that the subject of the extortion constitute commerce, only that commerce be affected in some way. *Carbo v. United States*, 314 F.2d 718, 732 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). *See also United States v. Staszcuk*, 517 F.2d 53 (7th Cir.), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); *United States v. Augello*, 451 F.2d 1167 (2d Cir. 1971), *cert. denied*, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972).

**1174**

### 1. Intangible Property

 The concept of property under the Hobbs Act has not been limited to physical or tangible "things." The right to make business decisions and to solicit business free from wrongful coercion is a protected property right. *See, e. g., United States v. Santoni*, 585 F.2d 667 (4th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979) (right to make business decisions free from outside pressure wrongfully imposed); *United States v. Nadaline*, 471 F.2d 340 (5th Cir.), *cert. denied*, 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414 (1973) (right to business accounts and unrealized profits); *United States v. Tropiano*, 418 F.2d 1069 (2d Cir. 1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970) (right to solicit business free from territorial restrictions wrongfully imposed by competitors). *Cf. United States v. Hathaway*, 534 F.2d 386, 395 (1st Cir.) *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976) (rejection of narrow perception of "property"); *Battaglia v. United States*, 383 F.2d 303 (9th Cir. 1967), *cert. denied*, 390 U.S. 907, 88 S.Ct. 817, 19 L.Ed.2d 874 (1968) (right to lease space in bowling alley free from threats).

 The trial court instructed the jury using the following language from *United States v. Tropiano, supra*, 418 F.2d at 1075: property includes "any valuable right considered as a source or element of wealth". No exception was noted. Chase's right to solicit business free from threatened destruction and physical harm falls within the scope of protected property rights under the Hobbs Act.

### 2. Coercion

 It is difficult to view the acts directed against the Night Moves and its proprietor as non–coercive. Threatened force may encompass fear of economic loss as well as physical violence. *See* Instruction No. 36. *Cf. United States v. Gates*, 616 F.2d 1103, 1106 (9th Cir. 1980) (inducing payments to avoid county business tax).

Appellants expressly communicated their purpose when a man, later identified as Caliguri, broke into the Chases' home, bound the occupants, and threatened to kill them if they did not give the Chases a message to "leave town." He warned that it was futile to reopen Night Moves because it would "come down again". The Chases had rebuilt the tavern after it was destroyed by a fire arranged by Williams in February 1978.

### 3. Consent

Appellants' argument that the convictions must be reversed because Chase was not induced to give up property "*with his consent*" ignores the fact that count 6 charged attempted extortion. The jury was so instructed.

 To prove the substantive act of attempted extortion there must be proof of an attempt to instill fear. *Carbo v. United States*, 314 F.2d 718, 741 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). Evidence of the previously described acts of intimidation and violence suffices. Appellants' objective was to induce Chase to give up a lucrative business. The fact that their threats were unsuccessful does not preclude conviction.

### 4. Criminal Liability

 On this and other substantive counts, the indictment charged liability as an aider and abettor and as a principal. 18 U.S.C. § 2. The jury was instructed on the complicity theory. Conviction as an aider and abettor requires proof the defendant willingly associated himself with the venture and participated therein as something he wished to bring about. *See United States v. Groomer*, 596 F.2d 356 (9th Cir. 1979). A review of the record reveals substantial evidence that appellants associated with and participated in the efforts against Chase.

John Carbone's primary connection to the Night Moves plot involves the November 1978 scheme to blow up the tavern. Vista Autos was the site of a crucial phone conversation with the bomber. The bomber discussed his demands, and requested the "contact" carry a paper bag for identification. John was present and listened briefly. A few hours later he was observed leaving Joe Carbone's Flitter In with Williams. Williams was carrying the requested paper bag. When Caliguri was arrested at a rendezvous with the bomber, agents found notes with the home phone numbers of John and Joe Carbone and Williams.

Ron Chase testified that Joe Carbone's Flitter In and Night Moves were two of only four topless dancing taverns in the county. The two remaining operations were also owned by Carbone. Carbone and Chase directly competed for dancers and customers. Joe Carbone and his sometime employee, Caliguri, visited the Night Moves after it opened. Caliguri was in Joe's employ when he tailed the Chases and broke into their home. Joe entered Vista Auto's office during the crucial phone conversation and listened to the final minutes. His home phone number was also found on Caliguri.

Caliguri was seen tailing the Chases in a Vista Autos car, even though he was not at that time employed by the dealership. He was identified at trial as having entered the Chases' home and threatened its occupants. He was arrested while serving as a go–between in the November 1978 bombing plot.

On tape Zemek admitted involvement in the Molotov cocktail incident at Night Moves. In a taped conversation he revealed his awareness of the Chases' rebuilding efforts after the February 1978 arson and of the efforts to drive Chase out of business.

Williams asked Valentine to arrange for the arson of Night Moves because it drew business from Mr. Lucky's. Co–defendant Bentley admitted setting the fire. Before soliciting the arson, Williams indicated he had asked "Joe" to make sure Chase did not operate under the protection of a well–known nightlife figure in the adjoining county. In November 1978 Williams solicit-ed help from an undercover agent in finding a bomber to destroy Night Moves.

This evidence more than satisfied the government's burden to prove active participation and willful association as to Zemek, Caliguri and the Carbones. The government established compelling evidence of Williams' participation as a principal in soliciting arson and arranging a bombing.

## OBSTRUCTING COMMUNICATION TO A CRIMINAL INVESTIGATOR

John Carbone and Williams were charged under 18 U.S.C. § 1510 with willfully endeavoring to obstruct communication of information relating to criminal violations, by attacking the property (count 7) and person (count 8) of Jerome Weinstein, the person they believed had given information to the IRS. Zemek was also charged under count 7.

Although the IRS had conducted a criminal investigation of John Carbone, Weinstein had not, in fact, been its informant. In January 1977 John Carbone was notified that the IRS investigation had concluded. Certain alleged acts of violence directed at Weinstein occurred thereafter.

Appellants assert these acts do not fall within the statutory proscription of 18 U.S.C. § 1510 because (1) Weinstein was not in fact an informant; (2) retaliatory acts are not proscribed; or (3) the statute does not cover threats or injuries inflicted *after* an investigation has terminated.

18 U.S.C. § 1510(a) provides:

Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator; or

Whoever injures any person in his person or property on account of the giving by such person or by any other person of any such information to any criminal investigator—

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

The statute has been construed as requiring proof of specific intent. *United States v. Carleo*, 576 F.2d 846 (10th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 153, 58 L.Ed.2d 152 (1978). While the first two paragraphs of § 1510(a) are phrased disjunctively, the indictment and jury instructions in this case were phrased conjunctively (i. e., the government must prove willful endeavor to obstruct communication and injury "on account of" giving information).

### 1. *Identity of Informant*

The identity of the actual IRS informant in 1976 is unknown. Carbone knew Weinstein had information of interest to the IRS and believed he had informed in the past. The government introduced ample evidence of the requisite mens rea supported by several corroborating acts.

Legislative history is silent regarding the necessity of proving a defendant had actual knowledge that an alleged informant had transmitted or would transmit information. The Third Circuit, relying on case law construing similar statutes, has held actual knowledge is not required and a "reasonably founded" belief will suffice. *See United States v. Kozak*, 438 F.2d 1062 (3d Cir.), *cert. denied*, 402 U.S. 996, 91 S.Ct. 2180, 29 L.Ed.2d 162 (1971). *See also, United States v. San Martin*, 515 F.2d 317 (5th Cir. 1975) (defendant knew or "reasonably believed" person had information).

■ The jury instruction in this case asked whether defendants knew or believed Weinstein was about to give information and had given information in the past. No exception was taken. The jury was also instructed that a mere threat of force unrelated to the communication of information would not violate the act. The jury was

adequately instructed. Appellants did not need to succeed in their efforts to prevent or delay communication of information. The statute speaks of "endeavors."

### 2. *Retaliatory Acts*

■ We reject appellants' argument that their convictions must be reversed because the statute does not proscribe retaliatory acts. Threats and intimidation may serve two purposes: (1) deterring future communications; or (2) retaliating for past communications. *United States v. Koehler*, 544 F.2d 1326, 1329 (5th Cir. 1977). While threats intended to thwart future communications clearly will support a conviction under § 1510, *United States v. Koehler, supra*, the Fifth Circuit has held that retaliatory threats will not support conviction. *United States v. San Martin*, 515 F.2d at 320.

The present record provides a basis to infer that appellants' purpose in attacking Weinstein was to deter future communications. Weinstein still posed a threat to Carbone. He had financial information of potential interest to the IRS. The IRS maintained a continuing interest in John Carbone. Carbone believed information was or *was about* to be given.

■ The evidence supports an inference that one purpose was to interfere with future communication of information. Thus, even were we to apply the Fifth Circuit's distinction between retaliation and deterrence, the convictions may be sustained.[21]

### 3. *Termination of Investigation*

■ It is not fatal that the IRS *investigation* terminated in January 1977, prior to the alleged acts and threats of violence. Section 1510 does not require "an

---

**21.** The *San Martin* court stated:

A literal reading of the provision of the statute under consideration indicates that it is aimed at deterring interference with future communication of information. It does not prohibit the making of a threat, *as opposed to the infliction of bodily injury*, in retaliation for having communicated information to a criminal investigator, at least where such a threat cannot be interpreted as having been intended to interfere with future communica-

tion of additional information or with continued cooperation.

515 F.2d at 320 (emphasis added).

The Fifth Circuit's distinction between retaliation and deterrence is arguably limited to 18 U.S.C. § 1510(a) ¶ 1 which speaks of willfully endeavoring to obstruct, delay or prevent communication. Paragraph 2 addresses actual injury "on account of" the giving of information. The instant case involved infliction of bodily injury, not merely the making of a threat.

investigation be taking place" concurrently with the proscribed acts. *See United States v. Lippman,* 492 F.2d 314, 317 (6th Cir. 1974), *cert. denied,* 419 U.S. 1107, 95 S.Ct. 779, 42 L.Ed.2d 803 (1975). The statutory focus is upon an endeavor to prevent communications to federal *investigators.*[22]

### 4. *Sufficiency of the Evidence*

Neither Williams nor John Carbone directly challenge the sufficiency of the evidence. There was ample evidence as to Williams' complicity. He hired Valentine to set fire to Weinstein's house in May 1978, offered Valentine an assault contract on Weinstein in 1978, and accepted money for protection. Relying entirely on his multiple conspiracies analysis rejected above, John Carbone does not challenge the sufficiency of the evidence as to the counts involving Weinstein.

 Zemek was charged under count 7 which alleged damage to Weinstein's property. In taped conversations, Zemek admitted responsibility for arranging a fire of Weinstein's garage door in March 1977. He said the attacks were made because Weinstein was an informant "on some tax deal." There was enough evidence that Zemek was aware of the relationship between the arson and Weinstein's perceived position as a "stoolie" to support his conviction as an aider and abettor.

## ILLEGAL GAMBLING BUSINESS

John Carbone, Williams and Mazzuca were charged with operating an "illegal gambling business" in violation of 18 U.S.C. § 1955. Count 9 involved pot limit poker and count 10 involved blackjack. Count 11 charged them and Janovich with a concurrent conspiracy to obstruct state law enforcement to facilitate this gambling business. 18 U.S.C. § 1511. Appellants object to the trial court's instruction defining "gross revenue" and Mazzuca, Carbone and Janovich challenge the sufficiency of the evidence as to specified counts.

### 1. *Gross Revenue*

Both 18 U.S.C. § 1955 and § 1511 require that an illegal gambling business: (1) violate state law; (2) involve five or more persons; and (3) operate substantially continuously for more than 30 days *or* have gross revenue of $2,000 in any single day. Mazzuca and Janovich question the government's proof of the $2,000 gross revenue option of the third requirement.[23]

 The district court's instruction defined gross revenue as "the total amount of money wagered in a single day not restricted to net profit." Appellants do not contend gross revenue should be equated with net profit.[24] Rather, they object to the court's refusal to give a proposed instruction containing this caveat: gross revenue does not include "side bets among players or wagers placed in a common pot." We find no error in the trial court's instruction in light of the evidence.

Courts discussing and rejecting the proposition that gross revenue is restricted to *net profit* broadly define gross revenue as "the total amount wagered" and do not differentiate between wagers placed against the house and wagers among players. *See e. g., United States v. Rotchford,* 575 F.2d 166, 174 (8th Cir. 1978); *United States v. Sacco,* 491 F.2d 995, 1001 (9th Cir. 1974); *United States v. Ceraso,* 467 F.2d 653, 656–57 (3d Cir. 1972).

Apparently no court has expressly determined if "gross revenue" excludes side bets.[25] In *United States v. Graham,* 534

---

**22.** Although the statute requires that the intended recipient of the communications be an "investigator" as defined under the act, (18 U.S.C. § 1510(b)), proof of that element is not challenged.

**23.** Count 9 of the indictment alleged operation of the pot limit poker games from May 23, 1978 to July 1, 1978. As to this count, the jury was instructed on the 30 day option.

**24.** Such an argument would be unavailing in light of *United States v. Sacco,* 491 F.2d 995 (9th Cir. 1974) (en banc).

**25.** Cases tried under the 30 day option of 18 U.S.C. § 1955, rather than the $2,000 gross

F.2d 1357 (9th Cir. 1976), this court suggested that side bets may be excluded from the gross revenue computation. There, as here, however, the record indicated that money was indeed wagered against the house.

The government offered testimony that the house had an interest in all amounts bet at the pot limit poker game: a dollar per pot charge plus a percent of each pot. House dealers would "rake off" the pot. The operation also provided dealers for blackjack and used shills to increase the ante in blackjack and poker games. Their winnings were returned to the house.

No evidence was introduced as to side–betting or between the players.[26] The court properly instructed the jury and did not err in refusing to give appellants' proposed instruction.

Mazzuca also challenges proof of $2,000 gross revenue as to count 10 (blackjack). Agent Transeth, an accountant, observed the action and conservatively estimated $4,000 bet in two hours. An undercover agent may observe and testify to the action. *Cf. United States v. Graham, supra.* The record provides sufficient foundation for the estimate. In addition, Williams bragged that $2,000 profit was possible on a good night. Finally, one of the operators testified to action of "a couple thousand" per night.

### 2. Black Jack and Pot Limit Poker

Neither Mazzuca nor Williams challenge the sufficiency of the evidence to convict under counts 9 and 10. Both had ownership interests in Mr. Lucky's. Both approached an operator to set up "after hours" pot limit

poker games and blackjack games; and both promoted the sale of Mr. Lucky's with the illegal gambling operations.

John Carbone frequently bragged of his profitable relationship with Williams. It is permissible to infer that he referred to on–going ventures in which Williams "performed" for him. John Carbone related to Weinstein that he had a proprietary interest in the illegal gambling business which Williams and Mazzuca operated in the rear of Stan & Ollie's.[27]

Surveillance agents observed Williams consulting with John Carbone before making major decisions. Williams excused himself midway through a preliminary discussion regarding the sale of Mr. Lucky's. He drove to John Carbone's Vista Autos and briefly conferred. Upon his return to Mr. Lucky's, Williams invited the undercover agents to an illegal blackjack game to be held that evening.

In light of this evidence and other circumstantial evidence of Carbone's active role, albeit behind–the–scenes, we cannot say that the evidence was insufficient to establish his complicity in the gambling operations.

### 3. Conspiracy to Facilitate Illegal Gambling

Mazzuca, Janovich, and John Carbone challenge the sufficiency of the evidence under count 11 charging violation of 18 U.S.C. § 1511 which proscribes a conspiracy to obstruct state law enforcement with intent to facilitate an illegal gambling business.[28] We find sufficient evidence of the

---

revenue option, do refer to occurrences of side betting. *See, e. g., United States v. Mattucci,* 502 F.2d 883, 886–87 (6th Cir. 1974). *Cf. United States v. Nettles,* 570 F.2d 547, 550 (5th Cir. 1978).

**26.** Mazzuca and Janovich also object to the court's allegedly prejudicial limitation of cross–examination of agent Early. Early observed the action and testified as to the betting. A review of the record indicates that the stricken questions, propounded by Mazzuca's counsel, addressed the issue of net profit, not side betting. It is clear that the trial court and co–counsel so construed the area of inquiry. In-

deed, co–defense counsel requested a mid–trial instruction clarifying that net profit is not to be equated with gross revenue.

**27.** One of the gambling operators testified that Mazzuca told him of a "higher up" in the operation who could be called upon to resolve disputes between Mazzuca and Williams.

**28.** 18 U.S.C. § 1511 provides in part:
(a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—

existence of a conspiracy and appellants' connection and knowing participation therein.

The government introduced tape recordings in which Mazzuca told the agent posing as a buyer of Mr. Lucky's that he and Williams would provide introductions to political figures who could guarantee no prosecutions or arrests for illegal gambling. Discussions of the protection aspect of the gambling business ensued. When a gambling operator complained about the necessity of "contributing" $100 to Janovich, Mazzuca said he had given $300. In a meeting with the undercover agent, Janovich expressed satisfaction that Mazzuca would remain at Mr. Lucky's after the sale. Mazzuca's argument that he was not a knowing participant is rejected.

Janovich asserts that the evidence established only a "mere association" with co–defendants and that his acceptance of money from the undercover agent established a separate conspiracy.

There was ample evidence that Janovich agreed to provide protection for the gambling operations as well as to harass would–be competitors. *See United States v. Panzanella*, 416 F.Supp. 68 (W.D.Pa.1976). His role in facilitating the gambling operation was established by testimony and his taped statements.

One operator testified that Williams assured him of protection from arrest because the sheriff was "in his hip pocket." If a raid was planned, they would receive two–hour advance notice. Taped statements by co–conspirator Williams refer to the sheriff's complicity. Williams arranged the initial meeting between Janovich and the agent posing as a buyer of Mr. Lucky's. Williams solicited $300 from the agent to be passed to Janovich. After the meeting, Williams reported that the sheriff would do business but wanted money "right away"

without any "heat." At the second meeting, Janovich acknowledged receipt of the first payment. He accepted $1,000 cash from the agent at this meeting.

Janovich's familiarity with the warning system and his intent not to enforce gambling laws to the detriment of enterprise operations were apparent in taped conversations. The evidence showed he was a member of the conspiracy to obstruct state gambling laws, as opposed to merely knowing and associating with the co–conspirators. *See United States v. Crockett*, 514 F.2d 64, 75 (5th Cir. 1975). His dealings with the agent did not form a separate conspiracy, but were acts in furtherance of a continuing conspiracy by inducing the "buyer" to become a new participant.

The government contends that John Carbone's role in the gambling protection conspiracy is confirmed by his relationship with Williams, his experience in providing protection, and his frequent solicitations for money for the sheriff's office to promote his "program."

Carbone told Weinstein that his business required that he give large amounts of money to politicians with the tacit understanding that help would be available. He bragged of his experience in arranging protection, insulating himself by dealing two or three people away.

Carbone regularly held meetings at his attorney's offices attended by Williams, Janovich and two of the sheriff's ranking subordinates. He told Weinstein the sheriff had removed a detective from active duty because he was "nosing around" too much. He frequently pressured his attorney for contributions to maintain his "program" with the sheriff's office.

The evidence was sufficient to show Carbone's connection to the conspiracy.

(1) one or more of such persons does any act to effect the object of such a conspiracy;

(2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and

(3) one or more of such persons conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business.

Williams was also charged under count 11 but does not challenge the sufficiency of the evidence.

## MAIL FRAUD

Counts 15 through 17 involve the October 1977 arson at an enterprise tavern, the Black Knight, and an alleged scheme to defraud insurance companies necessitating use of the mails.[29] John and Joe Carbone and Caliguri were convicted under these counts. All challenge the sufficiency of the evidence.

■■■ The essential elements of mail fraud are a scheme to defraud and knowing use of the mails to execute that scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Beecroft*, 608 F.2d 753 (9th Cir. 1979).

No one asserts that a plan to deliberately set a business on fire to obtain insurance proceeds would not constitute a scheme to defraud. Nor is it argued that mailing of the proceeds was insufficiently related to the scheme to defraud.

Appellants do challenge the sufficiency of the evidence to establish their participation in or knowledge of the mail fraud scheme. Appellants' intent can be inferred from their statements and conduct, *United States v. Beecroft*, 608 F.2d at 757, and from their knowledge that the scheme operated in a deceitful manner. *United States v. Piepgrass*, 425 F.2d 194, 199 (9th Cir. 1970).

There was evidence that John Carbone, not his son Richard, was the actual owner of the Black Knight. Williams borrowed money for the initial purchase in 1974. Thereafter John Carbone obtained a loan using the proceeds to pay Williams. Although Richard co-signed the note, John was the sole signatory on renewals.

The Black Knight was located in the Pierce County town of Puyallup and was its only topless dancing establishment. It shared topless dancers with Joe Carbone's topless clubs. Indeed, Joe often gave advice to the manager.

In June 1977, insurance on the tavern's contents was increased from $35,000 to $65,000 purportedly at Williams' request, although the authenticity of the signature is questioned. The government introduced evidence that business at the Black Knight was slack. Joe Carbone was planning to open a new topless tavern in Puyallup in the fall of 1977.

One of Joe Carbone's dancers testified that she overheard a conversation between Joe and Caliguri two weeks before the fire in which Joe stated that business was bad at the Black Knight and asked Caliguri to "take care of it." Three days before the fire, the tavern received a notice of violation for lewdness which could have required a temporary closure.

The tavern was destroyed by fire on October 30, 1977. Fire investigators eliminated all possible accidental causes. One week later Joe Carbone opened his new topless tavern in Puyallup.

Richard Carbone, the nominal owner of the Black Knight, took little interest in the fire or its aftermath. By contrast, John Carbone asked the insurance adjuster for fast action on the claim. Williams made several calls to the insurance company "for John." The proceeds, totalling $33,000, were used to pay John's note for the purchase.

---

**29.** 18 U.S.C. § 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

There was sufficient proof of John Carbone's financial interest in the tavern and the insurance proceeds. There was evidence to support the government's theory that Joe ordered the arson, motivated by the tavern's poor business and his plans to open a new topless tavern nearby. Evidence of motive and opportunity was abundant. The method chosen corresponded to prior "torchings" of enterprise businesses.

Contrary to his assertions, Caliguri was not a "neutral relation" of the principal actors. As prior manager of enterprise taverns, he was aware of insurance coverage for fire loss. John Carbone told Weinstein the Black Knight fire was done by a professional. There was evidence Caliguri was one of two men involved in the February 1978 arson of competitor Night Moves. While acting as an assistant for the Night Moves bomber, he stated that he had prior experience in destroying businesses.

■ This evidence and testimony that he was ordered to do something about the Black Knight less than two weeks before its destruction, support his conviction as an aider and abettor. The prosecution theorized Caliguri was aware of a high probability of fraud. He could not deliberately close his eyes to avoid learning the truth. *See United States v. McDonald*, 576 F.2d 1350, 1358 (9th Cir.), *cert. denied*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978). The evidence supports his conviction.

## CONCLUSION

Appellants, jointly and singly, raise additional objections. We have carefully reviewed the record and find no merit to their contentions.

■ Appellants strenuously object to the district court's denial of their severance motions. Fed.R.Cr.Pro 14. Assuming they properly preserved their objections by renewing the motions at the close of all the evidence, *see United States v. Kaplan*, 554 F.2d 958, 965 (9th Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977), we find no abuse of discretion in refusing to sever the trials.[30]

Janovich asserts that the trial judge engaged in improper prosecutorial conduct when he questioned a witness. He cites but one incident occupying five pages of a transcript exceeding 8,000 pages.

■ The court may examine a witness to clarify testimony if it avoids the appearance of partiality. *United States v. Allsup*, 566 F.2d 68, 72 (9th Cir. 1977). The challenged colloquy was well within the bounds of proper questioning. Janovich's objections to the grand jury proceedings are similarly without merit.

Williams' argument against forfeiture of his interest in Mr. Lucky's tavern pursuant to 18 U.S.C. § 1963(a), is merely derivative. It fails because his RICO conviction is affirmed.

Caliguri objects to discretionary evidentiary rulings and asserts that prejudicial outbursts from prosecution witnesses necessitated a mistrial. This was a protracted trial involving numerous charges, defendants and lawyers. Nonetheless, the record is remarkably free of even harmless error, let alone prejudicial error. The judge gave appropriate limiting instructions. Any error was harmless.

The district court judgment is affirmed. The mandate will issue at once. Release on bail as to any defendant is revoked now.

---

**30.** Spillover and inability to compartmentalize are the primary objections of Zemek, Janovich, Joe Carbone and Caliguri. We assume the jury follows limiting instructions to compartmentalize the evidence as to each defendant. *United States v. Escalante*, 637 F.2d 1197, (9th Cir., 1980). Such instructions were given during trial and before deliberations. There is no indication the jury was unable to appraise the evidence against each defendant in accord with the court's admonitions and instructions. *See United States v. Campan-*

*ale*, 518 F.2d 352 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). Of the eight persons jointly tried one (Levage) was acquitted.

Although the quantum of evidence as to certain defendants may have been greater than that as to others, such a disparity has been considered significant only when conspiracy charges were dismissed during trial. *See United States v. Polizzi*, 500 F.2d 856, 902, n. 11 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).